[No. B058873. Second Dist., Div. Six. June 4, 1992.]

SIMON UNZUETA, Plaintiff and Respondent, v.
OCEAN VIEW SCHOOL DISTRICT, Defendant and Appellant.

Lawler, Bonham & Walsh and Donald F. Austin for Defendant and Appellant.

Kronick, Moskovitz, Tiedemann & Girard and Donna Matties as Amici Curiae on behalf of Defendant and Appellant.

Hathaway, Perrett, Webster, Powers & Chrisman and Paul D. Powers for Plaintiff and Respondent.

A. Eugene Huguenin, Jr., Beverly Tucker, Diane Ross and Ramon E. Romero as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

YEGAN, J.—In 1935 Judge Learned Hand asked: "How far is a judge free in rendering a decision?" (Hand, The Spirit of Liberty (1952).) Judge Hand

did not answer the question but did put the judicial dilemma in perspective by saying: "So you will see that a judge is in a contradictory position; he is pulled by two opposite forces. On the one hand he must not enforce whatever he thinks best; he must leave that to the common will expressed by the government. On the other, he must try as best he can to put into concrete form what that will is, not by slavishly following the words, but by trying honestly to say what was the underlying purpose expressed. Nobody does this exactly right; great judges do it better than the rest of us. It is necessary that someone shall do it, if we are to realize the hope that we can collectively rule ourselves. And so, while it is proper that people should find fault when their judges fail, it is only reasonable that they should recognize the difficulties. Perhaps it is also fair to ask that before the judges are blamed they shall be given the credit of having tried to do their best. Let them be severely brought to book, when they go wrong, but by those who will take the trouble to understand." (*Id.*, at pp. 109-110.) Today we twice confront this dilemma.

We conclude that the trial court correctly found that Simon Unzueta was entitled to backpay but incorrectly refused to offset the amount by his earnings during the suspension period.

### *The First Dilemma*

The Ocean View School District (District) appeals from the trial court's writ of mandate ordering it to pay its teacher, Unzueta, approximately $40,000 in backpay. This amount of money represents Unzueta's salary for the period of time he was suspended by the District.

While employed as a teacher for the District, Unzueta was arrested and charged with simple possession and use of cocaine. (Health & Saf. Code, §§ 11350, subd. (a), 11550, subd. (a).) Without being required to do so, the District suspended Unzueta from his teaching position pursuant to Education Code section 44940, subdivision (e) which, in pertinent part provides: "Whenever any certificated employee . . . is charged with an optional leave of absence offense [here, simple possession and use of cocaine, see Education Code sections 44940 subdivision (b), 44011 subdivision (a)] . . . the governing board . . . *may* immediately place the employee upon compulsory leave in accordance with the procedure in this section and Section 44940.5." (Italics added.) Phrased otherwise, the District exercised its discretion in suspending Unzueta.

Pursuant to Penal Code section 1000 et seq., Unzueta satisfactorily completed a drug diversion program for first time offenders.

"Penal Code sections 1000 to 1000.4, enacted in 1972, authorize the courts to 'divert' from the normal criminal process persons who are formally

charged with first-time possession of drugs, have not yet gone to trial, and are found to be suitable for treatment and rehabilitation at the local level. ■ The purpose of such legislation, which has . . . been adopted with variations in several of our sister states, is two-fold. First, diversion permits the courts to identify the experimental or tentative user before he becomes deeply involved with drugs, to show him the error of his ways by prompt exposure to educational and counseling programs in his own community, and to restore him to productive citizenship without the lasting stigma of a criminal conviction. Second, reliance on this quick and inexpensive method of disposition, when appropriate, reduces the clogging of the criminal justice system by drug abuse prosecutions [fn. omitted] and thus enables the courts to devote their limited time and resources to cases requiring full criminal processing. [Citations.]" (*People* v. *Superior Court* (*On Tai Ho*) (1974) 11 Cal.3d 59, 61-62 [113 Cal.Rptr. 21, 520 P.2d 405].)

The charges against Unzueta were dismissed pursuant to Penal Code section 1000.3 which in pertinent part provides: "If the divertee has performed satisfactorily . . . the criminal charges shall be *dismissed.*" (Italics added.)

Upon resumption of his former teaching position, Unzueta petitioned the trial court for a writ of mandate to compel the District to pay him approximately $40,000 for approximately two years backpay pursuant to Education Code section 44940.5, subdivision (c). We presume that but for his experimentation with cocaine, Unzueta was an otherwise competent school teacher that the District wanted to employ.

Penal Code section 1000.5 states, in pertinent part, that "[u]pon successful completion of a diversion program *the arrest* upon which the diversion was based *shall be deemed to have never occurred.* The divertee may indicate in response to any question concerning his prior criminal record that he was not arrested or diverted for such offense. *A record pertaining to an arrest resulting in successful completion of a diversion program shall not*, without the divertee's consent, *be used in any way which could result in the denial of any* employment, *benefit*, license, or certificate." (Italics added.)

Education Code section 44940.5, subdivision (c) states, in pertinent part, ". . . if the employee is acquitted of the offense, or the charges against him . . . are dismissed, the school district shall pay to the employee his . . . full compensation for the period of the compulsory leave of absence upon his . . . return to service in the school district." ■ "As a remedial statute, it must be liberally construed 'to effectuate its object and purpose, and to suppress the mischief at which it is directed.' [Citation.]" (*Ford Dealers*

*Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 356 [185 Cal.Rptr. 453, 650 P.2d 328]; see also *Robinson* v. *Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 243 [5 Cal.Rptr.2d 782, 825 P.2d 767].) While not stated in so many words, the "mischief" at which Education Code section 44940.5 subdivision (c) is directed carries the connotation that the school district has unlawfully or erroneously suspended the teacher. ▮ We recognize that at the time of the suspension, the District did not unlawfully or erroneously suspend Unzueta. It was only through the legal fiction of Penal Code section 1000.5 that the arrest was ". . . deemed to have never occurred."

In response to the District's invitation to use its equity powers to nullify the effect of the statutes, the trial court said: "I can't rewrite the law. . . . I have to follow the statute." The trial court posited the following hypothetical: "What if he were charged with a crime and he spent two years in custody and the matter was delayed for one reason or another, time was waived, and he . . . was acquitted?" The District's counsel responded: "In that case the result would be he would get his two years' of income." There is no legal difference between the trial court's hypothetical and the situation where the criminal case is dismissed pursuant to Penal Code section 1385 or, in the instant case, dismissed pursuant to Penal Code section 1000.3.

There are situations when criminal cases are dismissed pursuant to Penal Code section 1385 and the "equities" are less than presented here, e.g., when the defendant provides information in criminal cases against third parties, when essential witnesses are not available for trial, when crucial evidence is suppressed or excluded resulting in the People's inability to proceed, or when there is a deprivation of right to speedy trial. In these instances, the moral culpability is greater than the situation where the defendant is rehabilitated pursuant to the legislative direction and the case is dismissed. Yet it seems beyond question that where a defendant is a school teacher in these hypothetical situations, he or she would be entitled to backpay. A dismissal is a dismissal. There is no requirement that the dismissal be "worthy."

Education Code section 44940.5 subdivision (c) must be read in pari materia with criminal dismissal statutes since it makes express reference thereto. ▮ " 'A statute must be construed "in the context of the entire statutory system of which it is a part, in order to achieve harmony among the parts." [Citation.]' " (*People* v. *Hull* (1991) 1 Cal.4th 266, 272 [2 Cal. Cal.Rptr. 2d 526, 820 P.2d 1036].) This principle applies even though the two provisions are in separate codes. (*Building Material & Construction Teamsters' Union* v. *Farrell* (1986) 41 Cal.3d 651, 665 [224 Cal.Rptr. 688, 715 P.2d 648]; *Tripp* v. *Swoap* (1976) 17 Cal.3d 671, 679 [131 Cal.Rptr. 789, 552 P.2d 749].)

 When Penal Code section 1000.5 and Education Code section 44940.5 subdivision (c) are read in pari materia, an expression of legislative intent emerges: a suspended teacher is entitled to backpay upon reinstatement after dismissal of the criminal case which led to the suspension. In fact, dismissal pursuant to Penal Code section 1000.3 and the broad language of Penal Code section 1000.5 that the arrest ". . . shall be deemed to have never occurred . . . [and the record of arrest] shall not . . . be used . . . in any way . . ." provides greater protection than the general criminal dismissal statute, i.e., Penal Code section 1385.

The language of Penal Code section 1000.5 is extraordinary and compelling. It demonstrates the breadth of the Legislature's underlying remedial purpose. "We determine that the use of the words 'shall not be used' and 'in any way,' in referring to the record of arrest of a successful divertee, is indicative of an intent by the Legislature that the protection of section 1000.5 be given the broadest application. [Citations.]" (*B. W.* v. *Board of Medical Quality Assurance* (1985) 169 Cal.App.3d 219, 232 [215 Cal.Rptr. 130].)

Given the language of Education Code section 44940.5 subdivision (c), it would be inappropriate for the judiciary to preclude backpay based upon an event which is ". . . deemed to have never occurred." Moreover, the District may not use the record of the arrest to deprive Unzueta of the "benefit" afforded pursuant to Penal Code section 1000.5. Contrary to the District's claim, the word "benefit" is not restricted to exclude backpay benefits under Penal Code section 1000.5. If there is some ambiguity as to this word, it must be construed in Unzueta's favor. (*Ford Dealers Assn.* v. *Department of Motor Vehicles, supra*, 32 Cal.3d at p. 356.)

Although the District concedes that the trial court followed the clear terms of these statutory provisions, the District urges us to reverse the trial court because its order violates common sense and public policy by rewarding a teacher for using drugs. Framing the issue in these terms illustrates the District's myopia. The legislative "reward" for use of drugs is criminal prosecution. The legislative reward for successful completion of diversion is dismissal of the criminal charge and rehabilitation of the experimental drug user by returning him to productive citizenship. When the successful divertee is a school teacher, an otherwise competent teacher is saved and backpay for time of suspension is given. Can we say, as a matter of law, that the Legislature did not intend this latter consequence given the language of Education Code section 44940.5 subdivision (c)? Is not the underlying purpose of a remedial statute to provide a remedy?

In essence, the District asks us to rewrite Education Code section 44940.5 subdivision (c) to except dismissals pursuant to Penal Code section 1000.3.

We decline the invitation. ■ " 'If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' [Citations.]" *(California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) ' "It is a prime rule of construction that the legislative intent underlying a statute must be ascertained from its language; if the language is clear, there can be no room for interpretation, and effect must be given to its plain meaning. [Citations.] "An intent that finds no expression in the words of the statute cannot be found to exist. The courts may not speculate that the legislature meant something other than what it said. Nor may they rewrite a statute to make it express an intention not expressed therein." ' [Citation.]" *(Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 412 [267 Cal.Rptr. 589, 787 P.2d 996]; see also *Anderson v. I. M. Jameson Corp.* (1936) 7 Cal.2d 60, 67 [59 P.2d 962]; Code Civ. Proc., § 1858.) "The plain meaning of words in a statute may be disregarded only when that meaning is ' "repugnant to the general purview of the act," or for some other compelling reason . . . .' [Citation.]" *(DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) "Courts must take a statute as they find it, and if its operation results in inequality or hardship in some cases, the remedy therefor lies with the legislative authority. [Citation.]" *(Jordan v. Retirement Board* (1939) 35 Cal.App.2d 653, 658 [96 P.2d 973].) ■ Here the language is clear, its application to Unzueta is not repugnant to the general purview of the act, and there is no compelling reason to disregard the plain language and underlying purpose of the statute. The Legislature may, of course, amend Education Code section 44940.5 subdivision (c) to except dismissals pursuant to Penal Code section 1000.3.

The District argues that because diversion did not exist in 1955, when the predecessor of section 44940 was enacted, the Legislature did not intend to require school districts to reimburse teachers for backpay in such instances. The Legislature, however, has never made the right to backpay dependent on the particular circumstances under which the acquittal or dismissal was obtained. Section 44940 has been amended four times since Penal Code section 1000 et seq. was enacted, without limiting or precluding backpay for employees whose dismissals were obtained because of successful completion of a drug diversion program. Section 44940.5, which currently contains the reimbursement provisions, was enacted in 1980, long after the Legislature enacted the diversion program in 1972.

■ "The Legislature is presumed to know the existing law and have in mind its previous enactments when legislating on a particular subject. [Citation.]" *(Rosenthal v. Cory* (1977) 69 Cal.App.3d 950, 953 [138

Cal.Rptr. 442]; see also *Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394].) If the Legislature desired to preclude backpay for those who obtain dismissals through diversion, it could simply have said so. (*Tiernan* v. *Trustees of Cal. State University & College* (1982) 33 Cal.3d 211, 219 [188 Cal.Rptr. 115, 655 P.2d 317].)

Realizing perhaps that it has not demonstrated a legislative intent to preclude backpay in the present circumstances, District seizes upon an exception to the foregoing rules of statutory construction. In *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 849, footnote 6 [59 Cal.Rptr. 609, 428 P.2d 593], our Supreme Court said that ambiguity is not a condition precedent to interpretation in all cases. " 'The literal meaning of the words of a statute may be disregarded to avoid absurd results . . . .' " (*Ibid.*; see also *Wells Fargo Bank* v. *Superior Court* (1991) 53 Cal.3d 1082, 1098 [282 Cal.Rptr. 841, 811 P.2d 1025].)

This exception should be used most sparingly by the judiciary and only in extreme cases else we violate the separation of powers principle of government. (Cal. Const., art. III, § 3.) We do not sit as a "super-legislature." (*Daybrite Lighting, Inc.* v. *Missouri* (1952) 342 U.S. 421, 423 [96 L.Ed. 469, 472, 72 S.Ct. 405].)

 We are not convinced as a matter of law that the Legislature did not intend the result we reach today. Phrased otherwise, we are not convinced as a matter of law that an award of backpay in these circumstances is "absurd." Absurdity, like beauty, is in the eye of the beholder.

The comments of Lord Bramwell are here apposite: " 'I should like to have a good definition of what is such an absurdity that you are to disregard the plain words of an Act of Parliament. It is to be remembered that what seems absurd to one man does not seem absurd to another . . . I think it is infinitely better, although an absurdity or an injustice or other objectionable result may be evolved as the consequence of your construction, to adhere to the words of an Act of Parliament and leave the legislature to set it right than to, alter those words according to one's notion of an absurdity.' Lord Bramwell, in Hill v. East and West India Dock Co., 9 A.C. 448, 464-65 (House of Lords, 1884)." (Aldisert, The Judicial Process (1976) p. 176.)

The dissent's answer to Lord Bramwell's quest for a definition of absurdity is: "I know it when I see it." Since *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137 (2 L.Ed. 60) where Chief Justice Marshall said: "It is emphatically the province and duty of the judicial department to say what the law

is. . . ." (*Id.*, at p. 177 [2 L.Ed. at p. 73]), judges have been given the task of construing laws passed by voters or their representatives. It is too late in the day to deny this power. (7 Witkin, Summary of Cal. Law (9th ed. 1985) § 56, pp. 97-98.) Thus, a dissenting justice has the power and the right to articulate his or her views. Indeed, if the dissent had one more vote, this court could, with two strokes of the pen, i.e., two signatures, construe Education Code section 44940.5 subdivision (c) to except dismissals pursuant to Penal Code section 1000.3 on the theory that to do otherwise would be absurd.

Each time the judiciary utilizes the "absurd result" rule, a little piece is stripped from the written rule of law and confidence in legislative enactments is lessened. Retired Justice Macklin Fleming describes this as the ". . . devaluation of written law and of legislative authority of popular assemblies." (Fleming, The Price of Perfect Justice (1974) p. 116, hereafter Fleming.) If the dissent had one additional vote, this court would sit as a "super-Legislature" with more than veto power over legislation. The court would have the power to add and substract from the plain language of a statute. Lord Bramwell would not be pleased with the dissent's definition of absurdity.

Contrary to the dissent's claim, we do not adhere to the "dictionary school of jurisprudence" (dis. opn., *post*, p. 1705) or become "slaves to the tyranny of literalness" (dis. opn., *post*, p. 1703). Although we are not called upon to redecide *Riggs* v. *Palmer* (1889) 115 N.Y. 506 [22 N.E. 188], we agree that it would be absurd as a matter of law to allow a murderer to financially profit by inheriting from his victim. "No one can take advantage of his own wrong." (Civ. Code, § 3517.) This salutary equitable rule was extant before *Riggs* v. *Palmer, supra*, was decided. (See, e.g., *New York Mutual Life Ins. Co.* v. *Armstrong* (1886) 117 U.S. 591, 600 [29 L.Ed. 997, 1000, 6 S.Ct. 877] ["It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of a party whose life he had feloniously taken."].)

Contrary to the situation in *Riggs* v. *Palmer, supra*, where the statutes were silent on the issue, here the Legislature has not been silent. It must be emphasized that at the other end of the judicial dilemma is the judge literally "making law" according to what he or she subjectively "thinks best." "[J]udicial legislation is all wrong because it is ineffectual. Experience has shown, and if the past is an accurate guide it will continue to show, that legislatures are better equipped, better informed, possess greater sensitivity, and exercise a broader vision in making new law than do the courts." (Fleming, *supra*, ch. 13, p. 120.)

In this instance, the dissent would abolish Education Code section 44940.5, subdivision (c) for a school teacher who has successfully done what the Legislature has asked him to do. In addition, Penal Code section 1000.5's prohibition against the deprivation of a "benefit" would be changed so that a benefit could be denied to a school teacher. The dissent seeks to enforce what it "thinks best." It should ". . . leave that to the common will expressed by the government." (Hand, The Spirit of Liberty, *supra,* at p. 109.)

"[J]udicial self-restraint . . . [should not be] reliance on a rope of sand." (Fleming, *supra,* ch. 19, p. 160.) ■ We hold that except in the most extreme cases where legislative intent and the underlying purpose are at odds with the plain language of the statute, an appellate court should exercise judicial restraint, stay its hand, and refrain from rewriting a statute to find an intent not expressed by the Legislature. (*People* v. *Superior Court (Ramos)* (1991) 235 Cal.App.3d 1261, 1271 [1 Cal.Rptr.2d 333].) "Our function is not to judge the wisdom of statutes. [Citations.]" (*Wells Fargo Bank* v. *Superior Court, supra,* 53 Cal.3d at p. 1099.) ■ While application of section 44940.5 to the present situation may be unwise, it does not lead to "absurd results" as a matter of law allowing for statutory construction. (*People* v. *Pieters* (1991) 52 Cal.3d 894, 898 [276 Cal.Rptr. 918, 802 P.2d 420].) Thus, as to the first dilemma, we answer Judge Hand's question by following the plain language of the statutes which sufficiently show the underlying purpose. This was and is a legislative choice. We are not free to enforce what we think best. We hold that a diversion dismissal is within the purview of Education Code section 44940.5 subdivision (c).

Our holding may be of first impression but it was forseen in *Sandoval* v. *State Personnel Bd.* (1990) 225 Cal.App.3d 1498 [275 Cal.Rptr. 702]. There it was held that Penal Code section 1000.5 applied only prospectively as to two correctional officers who were dismissed as employees for possessing small amounts of drugs and drug paraphernalia *before* they entered drug diversion programs. They were not given the retroactive benefit of Penal Code section 1000.5. The court recognized that "[i]f petitioners were reinstated in their jobs, arguably they would be entitled to backpay . . . ." (225 Cal.App.3d at p. 1503.)

*The Second Dilemma*

■ The District also urges us to order an offset of over $30,000, representing the amount Unzueta earned in other employment during the period of suspension. Unzueta contends and District concedes that there is no support for an offset in the statutory scheme for suspended teachers. Thus we confront the second dilemma.

"The cases have long held that the obligation to reimburse the teacher for the amount of salary wrongfully withheld may be mitigated by deducting

earnings from other employment. [Citations.]" (*Mass* v. *Board of Education* (1964) 61 Cal.2d 612, 627 [39 Cal.Rptr. 739, 394 P.2d 579]; see also *City of Ukiah* v. *Fones* (1966) 64 Cal.2d 104, 107 [48 Cal.Rptr. 865, 410 P.2d 369]; *Tarquinio* v. *Franklin-McKinley School Dist.* (1979) 88 Cal.App.3d 832, 836 [152 Cal.Rptr. 108]; cf., Gov. Code, § 19584 [codification of the mitigation of damage rule for state civil service employees].)

Relying on cases such as *Orloff* v. *Los Angeles Turf Club* (1947) 30 Cal.2d 110, 113 [180 P.2d 321, 171 A.L.R. 913], and *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 216 [185 Cal.Rptr. 270, 649 P.2d 912], Unzueta contends that the trial court correctly found that the statutory remedy for "full compensation" is exclusive to other remedies and no offset should be judicially created. There are two answers to this contention.

First, the trial court and this court are bound by pronouncements of the California Supreme Court where the facts of the present case are not fairly distinguishable from the facts of the case where the Supreme Court has declared the applicable principle of law. (*People* v. *Triggs* (1973) 8 Cal.3d 884, 891 [106 Cal.Rptr. 408, 506 P.2d 232]; *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Here, the facts are not fairly distinguishable from those in *Mass* v. *Board of Education, supra*, 61 Cal.2d 612. The Supreme Court's declaration of a rule of law is, by itself, a "compelling reason" to disregard the plain meaning of the phrase "full compensation." (*DaFonte* v. *Up-Right, Inc., supra*, 2 Cal.4th at p. 601.)

Second, ". . . in California there is a general policy giving full backpay awards upon reinstatement to a position because the compensation awards are designed to make the employee *whole*." (*Harris* v. *State Personnel Bd.* (1985) 170 Cal.App.3d 639, 644 [216 Cal.Rptr. 274], italics added.) Here, affording Unzueta $40,000 in backpay would make him more than whole. In fact, all but approximately $10,000 of the judgment constitutes a windfall. "When the reason for a rule ceases, so should the rule itself." (Civ. Code, § 3510.)

In contrast to our resolution of the first dilemma, an award of full compensation would result in a total income to Unzueta of $70,000 for the period of his suspension. This would be an example of an extreme case where legislative intent and the underlying purpose of the law are at odds with the plain language of the statute. In this instance, we may interpret the words "full compensation" to avoid absurd results. (*County of Sacramento* v. *Hickman, supra*, 66 Cal.2d at p. 849, fn. 6.)

Thus, as to the second dilemma, we answer Judge Hand's question by avoiding an absurdity and enforcing the underlying purpose of the statute. Of

course, we give attribution to our Supreme Court for guidance (*Mass* v. *Board of Education, supra,* 61 Cal.2d 612) and to the Legislature for its intent to make reinstated employees "whole," no more, and no less.

The matter is remanded to the trial court for a determination of the actual offset. In all other respects, the judgment is affirmed. Each side to bear its own costs on appeal.

Stone (S. J.), P. J., concurred.

**GILBERT, J.**—I respectfully dissent.

Absurdity—I know it when I see it. I agree with my colleagues that absurdity is in the mind of the beholder. Perhaps I am too prone to see it, but its specter haunts me in this case.

The school teacher here is arrested for possession of cocaine. He admits this to his principal and also admits he was under the influence of cocaine when he was arrested. The school teacher is placed on a leave of absence from teaching pursuant to statute. He is in a drug diversion program for almost two years. During this time, the California Commission on Teacher Credentialing suspends his teaching credential.

After successfully completing the drug diversion program, criminal charges against the teacher are dismissed pursuant to Penal Code section 1003. The District has good cause to fire the teacher, but instead gives him a break and allows him to come back to work. The teacher then sues the District for backpay during the time he was lawfully suspended.

Under the majority holding, the teacher would have received the full $40,000 in backpay had it not been that he fortuitously earned money during his suspension. A literal reading of the plain language of Education Code section 44940.5 compels this unfortunate result.

The school district's reference to *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 849, footnote 6 [59 Cal.Rptr. 609, 428 P.2d 593], is apt. The *Hickman* court acknowledged that in most cases ambiguity precedes interpretation. The *Hickman* court stated that "[a]though this proposition is generally true, 'The literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole.'" (*Ibid.,* citing *Silver* v. *Brown* (1966) 63 Cal.2d 841, 845 [48 Cal.Rptr. 609, 409 P.2d 689].)

In most cases, it is appropriate for courts to literally interpret statutes. The result that necessarily flows from clear, unambiguous language is almost always the "correct result," irrespective of whether the judge thinks it is wise or unwise. We must not, however, be slaves to the tyranny of literalness so that we construe a statute in a way that yields "a grotesque caricature of the Legislature's purpose." (Frank, *Words and Music, Some Remarks on Statutory Interpretation* (1947) 47 Colum.L.Rev. 1259, 1262.)

This case reminds me of *Riggs* v. *Palmer* (1889) 115 N.Y. 506 [22 N.E. 188]. Elmer was a beneficiary under his grandfather's will. He poisoned his grandfather and was convicted and sentenced to jail. The issue in *Riggs* was whether Elmer was entitled to inheritance under his grandfather's will. The New York statute of wills did not exclude a person who murdered the testator from taking under the will. Nevertheless, the majority opinion held that Elmer simply could not inherit.

Contemporary legal scholar, Ronald Dworkin, points out that the majority holding in *Riggs* gave the "legislators' intention an important influence over the real statute." (See Dworkin, Law's Empire (1986) pp. 15-20.) The writer of the majority in *Riggs* "relies on the distinction between the text, which he calls the 'letter' of the statute, and the real statute, which he calls the 'statute' itself. It would be absurd, he thought, to suppose that the New York legislators who originally enacted the statute of wills intended murderers to inherit, and for that reason the real statute they enacted did not have that consequence." (*Id.*, at pp. 18-19.)

Relying upon a canon of construction, the majority in *Riggs* wrote "that a thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers." (*Riggs* v. *Palmer, supra*, 22 N.E. at p. 189.)

The *Riggs* court concluded that if collateral consequences arise out of a statute which are contrary to common reason, then the statute should be void as to those collateral consequences. In *Riggs*, it goes against our system of shared values to have allowed the grandson to take under his grandfather's will. Such a result would be so unjust as to be absurd.

So, too, here would it be absurd and unjust to allow Unzueta to recover backpay. As the District points out, the purpose behind Education Code section 44940.5 is to protect students from teachers who have committed certain offenses. The purpose behind the drug diversion statute is to rehabilitate first-time drug offenders and to spare them the stigma of a criminal

record. (*Morse* v. *Municipal Court* (1974) 13 Cal.3d 149, 157 [118 Cal.Rptr. 14, 529 P.2d 46]; *Frederick* v. *Justice Court* (1975) 47 Cal.App.3d 687, 691 [121 Cal.Rptr. 118].) Penal Code section 1000 and Education Code section 44940.5 were not designed to provide teachers with an additional reward of backpay for the time spent on a drug diversion program.

The District may choose, as it did here, to place an employee on compulsory leave when that employee is charged with an offense. (Ed. Code, § 44940, subd. (e).) It is true Education Code section 44940.5, subdivision (c) requires the District to pay the employee full compensation for the period of his compulsory leave of absence if the employee is acquitted of the offense or the charges against him are dismissed.

The District must so act when the prosecution fails to convince the trier of fact of the teacher's guilt beyond a reasonable doubt. It may also occur when the prosecution cannot proceed, for example, because a crucial witness fails to appear. In such cases, the teacher, or any other person for that matter, always carries with him or her the presumption of innocence. The teacher remains in the same position as though he or she were innocent of the charge.

In the diversion statute, a dismissal is occasioned by entirely different circumstances. As a rule, a person accepting diversion has committed an offense, but not always. Sometimes a person who is in fact innocent of an offense charged against him might nevertheless request diversion. The particular circumstances of the case might make conviction a possibility. Diversion avoids having to face that possibility. In any event, dismissal for successful completion of diversion is of a different kind than is dismissal because of failure to prove the offense. Although for many purposes the two types of dismissal are treated the same, I doubt they were meant to be the same as far as Education Code section 44940.5 is concerned.

The majority concedes that for Unzueta to receive $40,000 from the school district after he had already received $30,000 for other employment during the time he was in the drug diversion program would be an absurd result. I applaud them for this insight. It is equally absurd, however, to award him $10,000, or any other amount of money.

If we can disregard the literal meaning of the statute to avoid the absurdity of paying the teacher $40,000, we can do the same to avoid the absurdity of paying him $10,000.

I find the majority's quote from Judge Learned Hand ironic. The school district urged us to read this reprint of a radio address by Judge Hand to

support its position that we should not interpret the statute so as to defeat common sense. The majority cites Hand, but fails to heed his advice. He warns us against following the dictionary school of jurisprudence. Judges who take this approach "follow the letter of the law absolutely. . . . No matter what the result is, he [or she] must read the words in their usual meaning and stop where they stop." Hand points out that "[n]o judges have ever carried on literally in that spirit, and they would not be long tolerated if they did." (Hand, The Spirit of Liberty, Papers and Addresses of Learned Hand (1952) p. 107.)

My approach is not to assert judicial supremacy over the Legislature. Quite the contrary. By interpreting the language of Education Code section 44940.5 beyond its literal language, I am acknowledging legislative supremacy. The "real statute," measured against the background of common sense and reason, dictates that Unzueta should receive no compensation for the 22 months of his suspension. He is lucky to have been rehired by the District. His luck should stop there.

A mechanical, literal interpretation of the statute in the lifeless atmosphere of a vacuum creates a result contrary to public policy, contrary to legislative intent, contrary to common sense, and contrary to our shared notions of justice.

I would reverse.

A petition for a rehearing was denied June 26, 1992, and appellant's petition for review by the Supreme Court was denied August 20, 1992. Lucas, C. J., Mosk, J., and George, J., were of the opinion that the petition should be granted.