Byron PAREDES–URRESTARAZU,
Petitioner,

v.

U.S. IMMIGRATION AND NATURAL-
IZATION SERVICE, Respondent.

No. 91–70143.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 9, 1993.

Decided April 25, 1994.

Francesco Isgro, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: TANG, D.W. NELSON, and LEAVY, Circuit Judges.

Opinion by Judge D.W. NELSON

D.W. NELSON, Circuit Judge:

Byron Paredes–Urrestarazu ("Petitioner") petitions this court for review of a decision of the Board of Immigration Appeals ("BIA" or "Board") that found him deportable under section 241(a)(4) of the Immigration and Nationality Act ("INA" or "Act"), 8 U.S.C. 1251(a)(2)(A)(ii), and denied him discretionary relief from deportation under section 212(c), 8 U.S.C. § 1182(c). Petitioner contends that the Board erred as a matter of law by failing to adhere to provisions of the California pretrial diversion program, Cal.Penal Code §§ 1000–1000.5 (Deering 1983 & Supp.1993), in determining whether he warranted section 212(c) relief. In addition, Petitioner maintains that the BIA abused its discretion by erroneously determining that he gave false testimony and failed to establish rehabilitation. We have jurisdiction under 8 U.S.C. § 1105a. We affirm.

## I. Factual and Procedural Background

Petitioner is a native and citizen of Guatemala. In 1970, at the age of 12, he was admitted into the United States as a lawful permanent resident. In 1979, Petitioner was convicted of five counts of armed robbery stemming from gang-related acts committed on May 4 and August 24, 1979, and served three years of a five year sentence prior to release on parole. On February 4, 1983, the day after Petitioner's incarceration ended, the Immigration and Naturalization Service ("INS") commenced deportation proceedings against him, contending that he was deportable under section 241(a)(4) of the Act for having been convicted of two crimes involving moral turpitude. Although Petitioner was scheduled to appear before an immigration judge in San Francisco on February 10,

Vera A. Weisz, Los Angeles, CA, for petitioner.

1983, he requested and received a transfer of his case to Los Angeles.

Subsequently, in 1986, Petitioner was arrested and charged with possession of narcotics. Instead of standing trial for the offense, Petitioner entered a pretrial diversion program pursuant to California Penal Code section 1000.2.[1] In 1987, after successful completion of his probation, the charges against Petitioner were dismissed in accordance with the provisions of the program. *See* Cal.Penal Code § 1000.3 (Deering 1983).

The deportation hearing was held on July 13, 1988. During the questioning, counsel for the INS asked Petitioner's wife if Petitioner had been arrested in 1986. Petitioner's counsel objected, contending that section 1000.5 of the California Penal Code, Cal.Penal Code § 1000.5 (Deering 1983) ("section 1000.5"),[2] prevented either Petitioner or his wife from having to answer this question. *See* Admin.Rec. at 82–86. The immigration judge ("IJ") overruled the objection, and Petitioner eventually testified as to the details and circumstances of the arrest. Petitioner's counsel also objected on the same ground to the introduction into evidence of the FBI "rap sheet" that indicated the fact of the 1986 arrest. The IJ, however, permitted its introduction. *Id.* at 119–20.

Based on the armed robbery convictions, the immigration judge found Petitioner deportable as charged. Turning to the requested Section 212(c) relief, the IJ concluded that Petitioner's seventeen year presence in the country, in addition to the fact that his wife, child, and numerous relatives were either United States citizens or lawful perma-

nent residents, indicated that he had "outstanding equities." Admin.Rec. at 49. However, the IJ found these positive factors outweighed by numerous others that demonstrated his "bad character and undesirability as a permanent resident in the United States." *Id.* In addition to Petitioner's prior convictions, abuse of PCP, lack of evidence of community involvement, and apparent false testimony regarding his military service, the IJ also considered the facts surrounding Petitioner's 1986 arrest, including that Petitioner directed to the arresting officers who attempted a body search an "obscenity [that] indicate[d] his disrespect for enforcement officers." *Id.*

Petitioner appealed the IJ's decision to the BIA, which affirmed. Engaging in a *de novo* review of the record, the BIA agreed with the IJ that Petitioner exhibited "unusual and outstanding" equities. Admin.Rec. at 10. However, like the IJ, the Board concluded that these equities were "outweigh[ed by] very serious adverse" factors. *Id.* The Board emphasized the gang-related 1979 armed robberies, Petitioner's 1979 general court-martial and dishonorable discharge from the military, his false testimony concerning his military service, and his past drug abuse.

The Board also considered explicitly the 1986 arrest, maintaining that it "demonstrates [Petitioner's] continuing disrespect for the law and probable continued use of drugs." Admin.Rec. at 10. Rejecting Petitioner's argument that section 1000.5 permitted Petitioner to refuse to acknowledge his

---

**1.** In California, a defendant accused of certain drug violations who has no prior "conviction for any offense involving controlled substances prior to the alleged commission" of the charged offenses may, under certain circumstances, be eligible for pretrial diversion. Cal.Penal Code §§ 1000–1000.2 (Deering 1982 & Supp.1993). If the court determines that the defendant would benefit from diversion, the accused is "referred for education, treatment, or rehabilitation" for a period ranging between 6 months and 2 years. *Id.* § 1000.2. If the accused successfully completes the diversion program, "at the end of the period of diversion, the criminal charges shall be dismissed." *Id.* § 1000.3. If not, criminal proceedings resume. *Id.*

**2.** Section 1000.5 provides:

Any record filed with the Department of Justice shall indicate the disposition in those cases diverted pursuant to this chapter. Upon successful completion of a diversion program the arrest upon which the diversion was based shall be deemed to have never occurred. The divertee may indicate in response to any question concerning his prior criminal record that he was not arrested or diverted for such an offense. A record pertaining to an arrest resulting in successful completion of a diversion program shall not, without the divertee's consent, be used in any way which could result in the denial of any employment, benefit, license, or certificate.

Cal.Penal Code § 1000.5 (Deering 1983).

arrest and prohibited the INS from introducing the FBI report, the Board concluded that "the immigration judge correctly considered the respondent's 1986 arrest and completion of a diversion program.... [Petitioner's] acts had legal consequences and can be properly considered by this Board in determining bad character, disrespect for the law and rehabilitation." *Id.* at 9. Finally, the Board determined that, although Petitioner had "shown on the surface a semblance of family life and employment" the evidence did not establish rehabilitation which, the Board asserted, "is an important element of [section] 212(c) relief." [3]

Petitioner now contends that the BIA's consideration of his 1986 arrest constituted reversible error because it violated California Penal Code section 1000.5. That provision expressly permits an accused who successfully completes the pretrial diversion program to indicate in response to questioning related to the offense in question that "he was not arrested or diverted for such [an] offense," and prohibits, without the divertee's consent, the use of "a record" of that arrest to deny the divertee "any ... benefit." Cal.Penal Code § 1000.5 (Deering 1983). Petitioner also maintains that the BIA abused its discretion in denying him section 212(c) relief by erroneously determining that he gave false testimony and did not adequately demonstrate rehabilitation.[4] We find these arguments meritless.

## II. The Elements of Section 212(c) Relief and the Standard of Review

■ Section 212(c) permits the Attorney General to grant discretionary relief from deportation or exclusion to lawful permanent residents who meet the statute's seven year residency requirement. *See* 8 U.S.C. § 1182(c) (1988); *Lepe–Guitron v. INS,* 16

F.3d 1021, 1023 (9th Cir.1994) (noting that section 212(c), despite its reference only to the exclusion of aliens, applies to deportation proceedings). As we explained in *Yepes–Prado v. INS,* 10 F.3d 1363 (9th Cir.1993):

> In exercising his responsibility, an IJ must determine whether to grant section 212(c) relief based on all the facts and circumstances of a particular case, taking into account the social and humane considerations presented in an applicant's favor and balancing them against the adverse factors that evidence the applicant's undesirability as a permanent resident. *In re Edwards,* Interim Dec[.] No. 3134, 1990 BIA [LEXIS 8, at] *9.

> The BIA has enumerated several factors to be considered in determining whether or not to grant a section 212(c) petition. Favorable considerations include: 1) family ties within the United States; 2) residence of long duration in this country (particularly when residence began at a young age); 3) hardship to the petitioner or petitioner's family if relief is not guaranteed; 4) service in the United States armed forces; 5) a history of employment; 6) the existence of business or property ties; 7) evidence of value and service to the community; 8) proof of rehabilitation if a criminal record exists; 9) other evidence attesting to good character. *Id.* at 10–11. To be weighed against these factors are 1) the nature and underlying circumstances of the exclusion or deportation ground at issue; 2) additional violations of the immigration laws; 3) the existence, seriousness, and recency of any criminal record; 4) other evidence of bad character or the undesirability of the applicant as a permanent resident. *Id.* at 11.

*Yepes–Prado,* 10 F.3d at 1365–66 (footnotes omitted). In this weighing process, "[a]s the

**3.** Board Member Dunne dissented as to the denial of section 212(c) relief. She contended that "section 1000.5 of the California Penal Code provides a basis for this court to refuse to consider Petitioner's 1986 arrest against him." Admin.Rec. at 13 (Dunne, concurring in part and dissenting in part). In addition, she found that "the record as a whole militates in favor of concluding" that Petitioner demonstrated rehabilitation. *Id.* at 14. Accordingly, Board Member Dunne would have granted Petitioner § 212(c) relief. *Id.*

**4.** In addition to affirming the IJ's denial of § 212(c) relief, the Board agreed with the IJ's determination of deportability and denied Petitioner's motion to remand to permit an application for relief under § 212(h). Petitioner does not challenge these rulings in this action.

negative factors grow more serious, it becomes incumbent upon the alien to introduce additional offsetting favorable evidence, which in some cases may have to involve unusual or outstanding equities." *In re Roberts*, Interim Dec. No. 3148, 1991 BIA LEXIS 9, at *5. A single serious crime or a pattern of misconduct can trigger a need to make this showing, *id.*, and to warrant a favorable exercise of discretion, an applicant with a criminal record "will ordinarily be required to present evidence of rehabilitation," *id.* at *6. However, "there are cases in which the adverse considerations are so serious that a favorable exercise [of discretion] is not warranted even in the face of unusual or outstanding equities." *Yepes–Prado*, 10 F.3d at 1366.

 This court reviews the agency's factual conclusions under the substantial evidence standard, *see id.* (citing *Martinez v. INS*, 970 F.2d 973, 974 (1st Cir.1992)), and the balancing of the equities for abuse of discretion, *id.* (citing *Vargas v. INS*, 831 F.2d 906, 908 (9th Cir.1987)). The agency must state its reasons for its decision and demonstrate that it considered all appropriate factors. *Id.* Questions of law, "such as whether the BIA applied the appropriate legal standard," are reviewed *de novo*. *Arteaga v. INS*, 836 F.2d 1227, 1228 (9th Cir.1988). In cases such as this, in which the Board has exercised its power to conduct a *de novo* review of the IJ's decision, we review only the decision of the BIA. *See Yepes–Prado*, 10 F.3d at 1366–67.

## III. Discussion

A. *The BIA did not Err in Refusing to Adhere to Section 1000.5 in Performing its Section 212(c) Analysis*

Petitioner raises two arguments in support of his claim that the Board erred by not following section 1000.5. First, Petitioner contends that the Board's failure to give effect to that provision was an impermissible exercise of section 212(c) discretion. Second, he appears to argue that the Board's refusal to adhere to section 1000.5 was an unexplained departure from prior practice. We reject both arguments.

1. *Does Section 212(c) Require the Board to Follow the Suppression Provisions of the California Diversion Scheme?*

 The federal government possesses plenary power over immigration. *See, e.g., Toll v. Moreno*, 458 U.S. 1, 11–13, 102 S.Ct. 2977, 2982–84, 73 L.Ed.2d 563 (1982); *Kleindienst v. Mandel*, 408 U.S. 753, 766–67, 92 S.Ct. 2576, 2583–84, 33 L.Ed.2d 683 (1972). And, the interpretation of the provisions of the INA is a question of federal law. *See, e.g., Morales–Alvarado v. INS*, 655 F.2d 172, 174 (9th Cir.1981) (holding that "conviction" within the meaning of the INA is "a matter of federal immigration law, not a matter of state law"); *accord Kahn v. INS*, 20 F.3d 960 (9th Cir.1994) (per curiam); *de la Cruz–Martinez v. INS*, 404 F.2d 1198, 1200 (9th Cir.1968), *cert. denied*, 394 U.S. 955, 89 S.Ct. 1291, 22 L.Ed.2d 491 (1969). Accordingly, the precise question we must answer is whether Congress intended that the BIA, in exercising its discretion under section 212(c) of the INA, must give effect to a state diversion regime such as California's.[5]

We have found no published decision by the Board or the federal courts that addresses this question. However, a review of decisions in which the BIA has exercised analogous discretionary authority indicates that the Board now holds the view that, absent an expression of congressional intent to the contrary, in making discretionary determina-

---

5. We assume for the purposes of this discussion that the initial questioning of Petitioner's wife would constitute a violation of section 1000.5, as would the introduction of the FBI rap sheet. *Cf. Unzueta v. Ocean View Sch. Dist.*, 6 Cal.App. 4th 1689, 1696, 8 Cal.Rptr.2d 614 (1992) ("The language of Penal Code section 1000.5 is extraordinary and compelling. It demonstrates the breadth of the Legislature's underlying remedial purpose. 'We determine that the use of the words "shall not be used" and "in any way," in referring to the record of arrest of a successful divertee, is indicative of an intent by the Legislature that the protection of section 1000.5 be given the broadest application.' " (quoting *B.W. v. Board of Medical Quality Assurance*, 169 Cal. App.3d 219, 232, 215 Cal.Rptr. 130 (1985))). *But cf. Sandoval v. State Personnel Bd.*, 225 Cal. App.3d 1498, 1502, 275 Cal.Rptr. 702 (1990) (contending that reliance on an arresting officer's personal testimony concerning the fact of arrest would not be prohibited by § 1000.5).

tions under the Act it may consider an alien's past conduct and legal consequences flowing from that conduct *regardless* of a state's policy to the contrary. Moreover, this circuit implicitly appears to have approved the Board's analysis.[6]

The underlying concern was recognized as early as 1943. In *In re Paoli*, 49 F.Supp. 128 (N.D.Cal.1943), the court faced the question of whether the expunging of a conviction pursuant to section 1203.4 of the California Penal Code precluded the court from considering the conviction in determining "good moral character" for the purposes of eligibility for citizenship. The court concluded that:

> If the circumstances are such that a state is willing to expunge the record of a crime, this fact may be persuasive in enabling the court before which application is made for citizenship to determine whether the character of the applicant is sufficiently good to permit his admission to citizenship.... *But it would hamper the court in the exercise of its discretion in determining the important question of moral character, if it were bound to disregard entirely the original act of the applicant in committing the crime.*

*Id.* at 130–31 (emphasis added).

The Board adopted this principle in *In re Gonzalez*, 16 I. & N. Dec. 134 (BIA 1977). There, the BIA disagreed with the Third Circuit's decision in *Giambanco v. INS*, 531 F.2d 141 (3d Cir.1976). The Third Circuit had held that a state judicial recommendation against deportation pursuant to section 241(b) of the Act,[7] which prevented a conviction from serving as the basis for deportation, precluded the Board from taking that conviction into account in determining whether the alien should receive the discretionary relief of adjustment of status. *See id.* at 147–49. Although acknowledging that *Giambanco* was binding on it for cases arising in the Third Circuit, the Board argued that:

The Act nowhere states that the criminal activity and the conviction which resulted therefrom cannot be considered in connection with an application for discretionary relief.... [Accordingly,] *all evidence of record including that conviction and the nature of the criminal activity, could be considered in determining whether the respondent is a person of good moral character and in exercising discretion under section 244(e) of the Act. Contrary to the view expressed by the [Giambanco] court, the interpretation suggested here is the same applied in those cases in which an expungement of the conviction has been obtained.*

*Id.* at 136 (emphasis added).

In support of its position, the Board cited both *In re H—*, 6 I. & N. Dec. 619 (BIA 1955), and *Paoli*. These cases, however, were in some tension. *H—* appeared to approve of a prior precedent in which the Board held that "a full and unconditional pardon not only serves as a bar to deportation but also wipes out the crime insofar as discretionary relief is concerned." *In re H—*, 6 I. & N. Dec. at 626 n. 1 (citing *In re Z—*, No. E–072431 (BIA 1954)). Indeed, *H—*, and the cases that followed its reasoning, appeared to hold that an expungement pursuant to California Penal Code § 1203.4 would not preclude further inquiry by the Board only because *California* did not recognize the statute as a "full and unconditional pardon by the executive authority of the State of California." *In re D—*, 7 I. & N. Dec. 670, 673 (BIA 1958), *overruled on other grounds by In re A—F—*, 8 I. & N. Dec. 429 (BIA 1959); *see also In re H—*, 6 I. & N. Dec. at 622 (noting that section 1203.4 does not "completely obliterate the fact that the unlawful acts occur[red]" (citing *Meyer v. Board of Medical Examiners*, 34 Cal.2d 62, 206 P.2d 1085 (1949)). By contrast, *Paoli*, also approved by the Board in a number of decisions, *see, e.g., In re S—R—*, 7 I. & N. Dec. 495, 499 (BIA 1957); *In re E—V—*, 5

---

6. Although the courts are the "final arbiters of statutory interpretation," we recognize that an "agency's construction of a statute that it is charged with administering is entitled to some deference." *Purba v. INS*, 884 F.2d 516, 517 (9th Cir.1989).

7. This provision, codified at 8 U.S.C. § 1251(b), was repealed by the Immigration Act of 1990, Pub.L. No. 101–649, § 505, 104 Stat. 4978, 5050 (1990).

I. & N. Dec. 194, 196 n. 4 (BIA 1953), made no distinction between the California statute and a "full and unconditional pardon," and broadly asserted that "[w]hether the offender was punished or forgiven, the act continues to exist as an indication of the character of the applicant." *In re Paoli*, 49 F.Supp. at 130–31.

Because the BIA interpreted a recommendation against deportation pursuant to section 241(b) as the equivalent of a "full and unconditional pardon," *e.g., In re D—*, 7 I. & N. Dec. at 673, under *Z—*, presumably a recommendation against deportation pursuant to section 241(b) would have demanded the result reached by the *Giambanco* court— that the recommendation against deportation *precluded* reliance on the conviction (and thus the conduct underlying it) in a discretionary determination. As the *Gonzalez* court reached the contrary conclusion, the Board clearly adopted the *Paoli* court's analysis. This conclusion is confirmed by the central concern articulated by the Board:

> Had no criminal action been instituted against the respondent, the fact of his involvement in the criminal activity could have been brought out and considered in connection with an application for discretionary relief. The court's ruling in *Giambanco* places him a position *superior* to the person who has not been convicted of his crime.

*In re Gonzalez*, 16 I. & N. Dec. at 136–37 (emphasis added).

*Gonzalez*, of course, only considered the effect of section 241(b) on an adjustment of status determination. However, the Board's reasoning as well as its broad rejection of *Giambanco*, a case which appeared to apply to *all* forms of discretionary relief,[8] suggested that the general principle that Congress did not intend for state expunging regimes to bar consideration of either past conduct or the consequences that the state attached to such conduct in a discretionary determination was applicable elsewhere. This reading of *Gonzalez* appears confirmed by *In re Seda*,

17 I. & N. Dec. 550 (BIA 1980), *overruled on other grounds by In re Ozkok*, 19 I. & N. Dec. 546 (BIA 1988), in which the Board held that, although a conviction expunged under a state expunging statute could not be considered "an admission of commission of the crime" for the purposes of barring eligibility for voluntary departure, the fact of the guilty plea properly could be considered as an "adverse factor ... in deciding whether a favorable exercise of discretion is warranted," *In re Seda*, 17 I. & N. Dec. at 554. A broad view of *Gonzalez* also was advanced by the Seventh Circuit in *Oviawe v. INS*, 853 F.2d 1428 (7th Cir.1988). There, the court took *Gonzalez* to stand for the general proposition that, as long as Congress had not excluded factors from consideration, the BIA should not be precluded from considering "*all* factors that bear on its exercise of discretion." *Id.* at 853 (emphasis in original). Adopting the BIA's reasoning, the Seventh Circuit held that it would be "anomalous" to conclude that the "BIA is foreclosed from considering adverse information to balance against positive information when weighing the equities of a situation." *Id.*

Our circuit also implicitly has accepted a broad reading of *Gonzalez*. In *Delgado–Chavez v. INS*, 765 F.2d 868 (9th Cir.1985) (per curiam), we expressly rejected *Giambanco, id.* at 869–70, and held that a prior conviction that section 241(b) precluded from serving as a basis for deportation nonetheless "may be considered as an adverse factor in deciding whether the favorable exercise of discretion is warranted," *id.* at 869 (citing *In re Seda*, 17 I. & N. Dec. 550, 554 (BIA 1980)).[9] Subsequently, we stated in *Villanueva–Franco v. INS*, 802 F.2d 327 (9th Cir.1986), that *Delgado–Chavez* stood for the proposition that the "BIA may consider [an] alien's conviction and other adverse conduct in the exercise of [its] discretion," *id.* at 330.

■ The principle underlying *Gonzalez* plainly is applicable to section 212(c). Determining whether section 212(c) relief should

---

8. *See Gonzalez*, 16 I. & N. Dec. at 134 n. 1 (noting that it interpreted *Giambanco* as applicable to "all discretionary applications under the Act").

9. *Delgado–Chavez*, in fact, was relied upon by the Seventh Circuit in *Oviawe*. *See Oviawe*, 853 F.2d at 1432–33.

be awarded involves the same type of balancing of equities the Board must undertake in the discretionary determinations considered in the adjustment of status and voluntary departure contexts. *See Yepes–Prado,* 10 F.3d at 1365 (stating that section 212(c) requires the Board to examine "all the facts and circumstances of a particular case"); *In re Edwards,* 1990 BIA LEXIS at *10 ("The exercise of discretion in a particular [section 212(c)] case necessarily requires consideration of all the facts and circumstances involved."); *accord In re Buscemi,* 19 I. & N. Dec. 628, 633 (BIA 1988); *cf. Campos–Granillo v. INS,* 12 F.3d 849 (9th Cir.1994) (citing section 212(c) cases in discussing the factors relevant to a discretionary determination involving voluntary departure). Therefore, as long as the Board does not consider inappropriate or irrelevant factors, *see Yepes–Prado,* 10 F.3d at 1367–69; *cf. Rassano v. INS,* 492 F.2d 220, 227 (7th Cir.1974), we think that the breadth of the section 212(c) inquiry permits the Board to consider evidence of conduct that does not result in a conviction. *Cf. Parcham v. INS,* 769 F.2d 1001, 1005 (4th Cir.1985) ("Evidence of an alien's conduct, without conviction, may be considered in denying the discretionary relief of voluntary departure."), *paraphrased in Villanueva–Franco,* 802 F.2d at 330.

 The fact of arrest, insofar as it bears upon whether an alien might have engaged in underlying conduct and insofar as facts probative of an alien's "bad character or undesirability as a permanent resident" arise from the arrest itself, plainly can have relevance in performing the analysis required by section 212(c).[10] Furthermore, we believe that to permit the California expunging regime to limit the section 212(c) inquiry by barring evidence of the fact of an alien's arrest might result in the anomaly identified in *Gonzalez* —the arrest actually could *improve* an alien's position: if the alien in question is not arrested, for instance, but merely stopped by the police, an account of the relevant events could be elicited from him; but if the alien instead is arrested and the California diversion regime is respected, then the INS would be precluded from questioning the alien concerning the arrest or from introducing a record of the same, with the likely outcome that the tribunal undertaking the section 212(c) determination never would learn of relevant facts.

Like the Board in *Gonzalez,* we do not think Congress intended to mandate such anomalies. And, as this circuit stated in interpreting the term "conviction" in the INA: "Deportation is a function of federal and not state law. . . . 'It would defeat the purposes (of federal law) if provisions of local law, dealing with rehabilitation of convicted persons, could [defeat federal policy]. . . . We do not think Congress intended such a result.'" *de la Cruz Martinez,* 404 F.2d at 1200 (quoting *Garcia–Gonzales v. INS,* 344 F.2d 804, 809 (9th Cir.), *cert. denied,* 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965) (alternations added)); *cf. Kahn,* 20 F.3d 960 (holding that the BIA's conclusive adoption of state definitions of marriage was not "rationally related" to the INA's purpose of ensuring "'a uniform federal [immigration] policy'" (quoting *Rosario v. INS,* 962 F.2d 220, 223 (2d Cir.1992))). Consequently, as long as Congress has not implicitly demanded adherence to section 1000.5, we believe that to require the Board to give effect to that provision would impair impermissibly the BIA's ability to undertake the particularized assessment that section 212(c) demands.

Here, we do not find that Congress implicitly has indicated that the BIA cannot question Petitioner concerning the arrest or cannot consider a record of that arrest. It is true that Congress, in what became known as the Federal First Offender Statute ("FFOS"), 21 U.S.C. § 844(b)(1), and its successor provision codified at 18 U.S.C. § 3607, has provided a mechanism very similar to the California diversion program.[11] A first-time

---

10. We do not hold that the fact of an arrest *vel non always* constitutes a relevant factor. *See also infra* pp. 3998–99 & n. 15. To conclude that the California diversion regime need not be given effect by the Board, however, only requires us to determine that the fact of arrest *can* be relevant to the section 212(c) calculus.

11. The FFOS was repealed by the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–

narcotics offender, upon a determination of guilt by the court, may have the entry of judgment of guilt withheld and may be placed on probation for up to one year. 21 U.S.C. § 844(b)(1). That provision further provides that, upon successful completion of probation, the charges will be dismissed "without court adjudication of guilt, but a nonpublic record shall be retained by the Department of Justice solely for the purpose of use by the courts in determining whether or not, in subsequent proceedings, such person qualifies under this subsection." *Id.*

■ More importantly, the statute also contains a provision suppressing the record of arrest almost identical to that found in section 1000.5. It provides that upon successful completion of the probationary period, the court shall enter an order:

> expung[ing] from all official records ... all recordation relating *to his arrest*, indictment, or information, trial, findings of guilty, and dismissal and discharge pursuant to this section.... *The effect of such order shall be to restore such person in the contemplation of the law, to the status he occupied before such arrest or indictment or information.* No person as to whom such an order has been entered shall be held thereafter under any provision of any law to be guilty of perjury or otherwise giving a false statement by reason of his failures to recite or acknowledge such arrest, or ... in response to an inquiry made of him *for any purpose.*

473, § 219, 98 Stat. 1837, 2027 (1984) (effective Nov. 1, 1987). Section 3607 of Title 18, United States Code, was promulgated by § 212(a)(2) of the same Act. *See id.* § 212(a)(2), 98 Stat. 2003–04 (effective Nov. 1, 1987). For the purposes of our analysis, the differences between 21 U.S.C. § 844(b) and 18 U.S.C. § 3607 are immaterial. As the Senate Report states, "[p]roposed 18 U.S.C. § 3607 carries forward the provisions of 21 U.S.C. § 844(b) relating to special probation without entry of judgment for first offenders found guilty of violating [21 U.S.C. § 844] if there has been no previous conviction of an offense under a Federal or State law relating to controlled substances." S.Rep. No. 98–225, 98th Cong., 2d Sess. 133 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3316.

**12.** Although the meaning of the term "conviction" is a question of federal law, *see, e.g., Moralez–Alvarado v. INS*, 655 F.2d 172, 174 (9th Cir.

21 U.S.C. § 844(b)(2) (1988) (emphasis added); *see also* 18 U.S.C. § 3607(c) (providing a materially indistinguishable mechanism).

We think that if section 844(b)(2) or its substantially identical successor were applicable to Petitioner, he would have a compelling argument that Congress intended to preclude from the section 212(c) analysis state statutes that were the equivalent of this provision. The BIA itself has long interpreted other provisions of the INA with an eye toward eliminating disparities in treatment among aliens that results merely from the fortuity of whether a criminal prosecution has been brought by federal or state authorities. For instance, in the context of determining the meaning of the term "conviction" in the INA, the BIA has held that state statutes that are the "equivalent" of both the FFOS and the now-repealed Federal Youth Corrections Act ("FYCA"), 18 U.S.C. §§ 5005–26 (1982), *repealed by* Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 218(a)(8), 98 Stat. 1837, 2027 (effective Oct. 12, 1984), should have the same effect as their federal counterparts. *See, e.g., In re Werk*, 16 I. & N. Dec. 234, 235–36 (BIA 1977) (holding that state equivalents of the federal first offender statute ("FFOS"), 21 U.S.C. § 844(b)(1) (repealed 1984) will have the same effect as the federal provision); *In re Andrade*, 14 I. & N. Dec. 651, 652 (BIA 1974) (holding the same with respect to the FYCA).[12] Then–Solicitor Gener-

1981); *Molina v. INS*, 981 F.2d 14, 19–20 (1st Cir.1992), the INS has long held that "a conviction for a crime involving moral turpitude may not support an order of deportation if it has been expunged." *In re Ozkok*, 19 I. & N. Dec. 546, 552 (BIA 1988); *see also Garcia–Gonzales v. INS*, 344 F.2d 804, 809–10 (9th Cir.) (citing decisions), *cert. denied*, 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965). An exception to this rule was created in cases involving narcotics convictions, where the "serious Federal concern" with narcotics offenders led the Attorney General and the INS to conclude that, as long as the adjudication of guilt was sufficiently final for federal purposes, a conviction for a narcotics violation should be considered final regardless of the effect of a state expunging regime. *See, e.g., In re A—F—*, 8 I. & N. Dec. 429, 445 (BIA 1959); *de la Cruz Martinez*, 404 F.2d at 1200 (approving this interpretation). *Werk*, and *Andrade*, discussed in the text, represent an exception to this exception.

al Bork described the rationale behind this interpretation of the INA as follows:

> Expungement statutes concerning youth offenders, perhaps even more than other expungement laws, *reflect a policy of providing a clean start which would be virtually negated if deportation under federal law were still a consequence of an expunged state marihuana conviction of a youth.* . . . .
>
> Thus, [not to give effect to state equivalents of the FYCA] would tend to produce the anomalous situation where, for example, a youth offender prosecuted federally and convicted of a serious marihuana offense would not be deportable if the conviction were expunged, while one prosecuted in state court and convicted on a trivial marihuana offense would therefore be deportable, even if the conviction were expunged.

*Quoted in Andrade,* 14 I. & N. Dec. at 658–59 (emphasis added).

Consequently, we assume *arguendo* that section 212(c) must be interpreted to minimize the effect of diluting federal policy that arises from the mere fortuity that the state, and not the federal government, prosecutes an alien for a particular offense. *Cf. Kahn,* 20 F.3d at 961–62; *Jaramillo v. INS,* 1 F.3d 1149, 1155 (11th Cir.1993) (approving the Board's interpretation of section 212(c) in part because it furthered "a uniform nationwide application of the immigration laws"). Accepting this premise, it stands to reason that Congress did not intend that a first-time narcotics offender should be denied the benefit of section 1000.5 when, had the federal government undertaken the prosecution, an equivalent suppression provision would have been triggered.

Section 844(b)(2) and its successor provision found in 18 U.S.C. § 3607(c), however, are both limited *by their terms* to those persons under "twenty one years of age at the time of the offense." 21 U.S.C. § 844(b)(2); 18 U.S.C. § 3607(c) (same). It

is apparent from this limitation that Congress did not intend to confer the same privilege to first offenders *over* that age. Petitioner was 28 at the time of the arrest in question. Accordingly, it cannot be concluded that Congress impliedly has required giving effect to section 1000.5 in this case.

Finally, Petitioner relies upon *United States v. Hidalgo,* 932 F.2d 805, 807 (9th Cir.1991), for the proposition that, as a matter of federal law, the BIA must give effect to the diversion regime. *Hidalgo,* however, involved the question of whether a sentence had been "expunged" within the meaning of U.S.S.G. § 4A1.2(i). Although the court appeared to acknowledge that the meaning of "expunged" was itself a question of federal law, *see id.* at 807, it also recognized that determining whether a conviction was "expunged" *necessarily* required assessing the effect of a state expunging regime, *see id.* Section 212(c), by contrast, does not require the Board, in defining a term, to examine the legal effect that a state attaches to conduct or proceedings. *See Kahn,* 20 F.3d at 962. Moreover, nothing in the scant legislative history suggests an intent on the part of Congress to make the application of section 212(c) dependent on state law. *Cf. Thrall v. Wolfe,* 503 F.2d 313, 317 (7th Cir.1974) ("[A]bsent an express contrary intention, the scope of a federal statute normally is not dependent on state law." (citing *Jermone v. United States,* 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L.Ed. 640 (1942) (emphasis added))), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975).[13] Accordingly, *Hidalgo* is inapposite.

We are cognizant that this is a case in which "the policies of the two governments are at loggerheads: The state wishes to give the defendant a clean slate, yet federal law makes the record indelible." *United States v. Tallmadge,* 829 F.2d 767, 782 (9th Cir. 1987) (Kozinski, J., dissenting). However, given the breadth of the section 212(c) inquiry, the federal policy must trump that of California. Absent a federal policy to the

---

13. If anything, the brief remark in the legislative history of the original version of the statute that "discretionary authority to waive the grounds for exclusion should be carefully restricted to those cases where extenuating circumstances clearly require such action and that the discretionary authority should be surrounded with strict limitations," H.R.Rep. No. 1365, 82d Cong., 2d Sess. (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1705, suggests the opposite.

contrary, state law cannot " 'rewrite history for the purposes of [federal law].' " *United States v. Bergeman,* 592 F.2d 533, 536 (9th Cir.1979) (quoting *Hyland v. Fukuda,* 580 F.2d 977, 981 (9th Cir.1978) (quoting *United States v. Potts,* 528 F.2d 883, 887 (9th Cir. 1975) (en banc) (Sneed, J., concurring))). Accordingly, in the case of this particular alien, we hold that the Board was not required to give effect to the California diversion scheme in undertaking its section 212(c) analysis.

2. *Did the Board Inexplicably Depart from Prior Policies?*

▬ Even if the Board is not *required* to incorporate the California diversion regime in its section 212(c) analysis as a matter of statutory interpretation, it cannot *refuse* to do so if it would thereby "act[ ] arbitrarily [by] disregard[ing] its own precedents and policies without giving a reasonable explanation for doing so." *Braun v. INS,* 992 F.2d 1016, 1019 (9th Cir.1993). Petitioner notes that, in *In re Zignis,* 14 I. & N. Dec. 621 (BIA 1974), the BIA held that a conviction set aside under the FYCA could not serve as the basis for deportation because such a result would be inconsistent with Congress's objective of "rehabilitat[ing] youthful offenders." *In re Zignis,* 14 I. & N. Dec. at 622. Section 1000.5, Petitioner contends, has the same purpose of " 'restor[ing] a successful divertee to productive citizenship without the stigma of a criminal conviction.' " Brief for Petitioner at 17 (quoting *B.W. v. Board of Medical Quality Assurance,* 169 Cal.App.3d 219, 233, 215 Cal.Rptr. 130 (1985)). Accordingly, Petitioner maintains that because the BIA gave effect to the FYCA in *Zignis,* it similarly must respect the California diversion scheme here.

Petitioner's analogy to *Zignis* is misplaced. *Zignis* did not hold, as Petitioner appears to contend, that an expunging or diversion statute will be given effect by the Board *whenever* it reflects a rehabilitative goal. The rationale behind *Zignis* was that when a *federal* policy indicates that Congress wishes to expunge a conviction, it should not be consid-

ered a conviction for immigration purposes. *See In re Zignis,* 14 I. & N. Dec. at 622–23 ("The desire of Congress to give youth a new chance would be thwarted by deportation. Its policy provides for expungement of offenses by juveniles is as important a congressional policy as the policy to deport narcotics offenders.").

The California diversion scheme, of course, is a *state* and not a federal enactment. Petitioner's reliance on *Zignis* would still have force, however, if a federal policy exists for which the California diversion is a "state equivalent"; as discussed above, the BIA has a long-standing practice, based on the objective of achieving greater uniformity in the administration of the immigration laws, of giving effect to state rehabilitative statutes that mirror federal enactments. *See supra* 918–919 & n. 12.

The BIA's practice, however, is not applicable in this case. The only plausible federal policy for which section 1000.5 could constitute a "state equivalent" is that found in 21 U.S.C. § 844(b)(2) and 18 U.S.C. § 3607(c), discussed above. *See supra* 917–919; *see also In re Deris,* Interim Dec. 3102, 1989 BIA LEXIS 8, at *7–*13 (holding that the "state equivalent" policy continues to apply to section 3607). However, as noted previously, the California provision, unlike sections 844(b)(2) and 3607(c), is *not* limited to those under 21 years of age, and the Board has held that, to qualify for "state equivalent" status, the state statute must encompass roughly the *same* limited class as the federal statute. *See, e.g., Matter of Carrillo,* 19 I. & N. Dec. 77, 80 (BIA 1984); *Matter of Forstner,* 18 I. & N. Dec. 374, 376 (BIA 1983); *Matter of Golshan,* 18 I. & N. Dec. 92, 95 (BIA 1981).[14] Of course, if the California statute were so limited, Petitioner, who was 28 at the time of the arrest in question, would not qualify under it. Accordingly, Petitioner's contention that the BIA inexplicably abandoned a prior policy must be rejected; in this case, that policy simply is not implicated.

---

14. We do not hold that the California diversion regime does not qualify as a "state equivalent" to section 3607 for other purposes. *Cf. In re Deris,* 1989 BIA LEXIS 8 at *7–*13. We only decide

that the suppression provisions found in section 1000.5 do not constitute a state equivalent of 21 U.S.C. § 844(b)(2) or 18 U.S.C. § 3607(c).

### B. *The Board did not Abuse its Discretion in Denying Section 212(c) Relief*

In addition to claiming that the BIA mistakenly failed to adhere to section 1000.5, Petitioner asserts that the BIA erred in two other respects: first, by finding that Petitioner had given false testimony concerning his service in the military, and second, by failing to find rehabilitation. Because of these erroneous determinations, Petitioner maintains, the Board improperly weighed the equities and thereby abused its discretion. We reject these contentions.

#### 1.

Substantial evidence supports the IJ's determination that Petitioner gave false testimony. During Petitioner's testimony in front of the IJ, the following colloquy took place between the INS's counsel and Petitioner:

Q: Did you serve in the military?

A: No.

Q: You never served in the military?

A: No.

Q: You never served in the U.S. Army?

A: Yea, well . . .

Q: Didn't you serve in the U.S. Army?

A: It was brief, I don't know whether you [would] call [it] service or not.

Admin.Rec. at 124. Subsequently, Petitioner revealed that he had been dishonorably discharged and court-martialed. *Id.* at 125. In its opinion, the IJ maintained that Petitioner changed his answer from "No" only when he "realized that the trial attorney had in her possession a record indicating that he had in fact served in the military," *id.* at 47, and concluded on this basis that Petitioner "gave false testimony with respect to his military service for the purpose of obtaining . . . relief from deportation pursuant to Section 212(c)," *id.* at 48. The Board adopted this finding. *Id.* at 10.

Petitioner contends that this finding by the IJ and its use by the Board was unsupported by the record because the record shows that Petitioner did not intend to deceive the IJ but rather was "ashamed" of his dishonorable discharge, *id.* at 146, and simply wished to avoid embarrassment. *Cf. Kungys v.*

*United States*, 485 U.S. 759, 780, 108 S.Ct. 1537, 1551, 99 L.Ed.2d 839 (1988) (accepting the government's argument that 8 U.S.C. § 1101(f)(6), which precludes a finding of good moral character when false testimony is given for the purpose of obtaining a naturalization benefit, proscribes only the "precise intent" to obtain the benefit sought and not "[w]illful misrepresentations made for other reasons, such as embarrassment").

 As the IJ appeared to find the specific intent described in *Kungys*, we assume *arguendo* that this determination was necessary to support the IJ's finding. Even so, we reject Petitioner's argument. The IJ essentially made a credibility determination concerning Petitioner's explanation for his conduct, and we accord such a determination "substantial deference" as long as it is supported by a " 'specific, cogent reason' for the disbelief." *Berroteran–Melendez v. INS*, 955 F.2d 1251, 1256 (9th Cir.1992) (quoting *Turcios v. INS*, 821 F.2d 1396, 1399 (9th Cir. 1987)). We have no reason to doubt the eyewitness account of the IJ that Petitioner changed his answer only upon counsel's revelation of certain documents. Moreover, Petitioner's sudden willingness to explain all the details relevant to the court-martial supports the IJ's explanation far more readily than Petitioner's claim that embarrassment was the *sole* reason for his conduct. Accordingly, we find no error in the IJ's conclusions with respect to false testimony.

#### 2.

 We also believe that the record supports the BIA's determination that Petitioner did not establish rehabilitation. Petitioner claims that the "BIA disregarded the extensive evidence of rehabilitation presented without providing a reasonable explanation for doing so." Brief for Petitioner at 32. However, a close examination of the BIA's decision reveals that it addressed both the positive and the adverse factors, and that the finding of no rehabilitation was based on a consideration of all relevant factors. *See* Admin.Rec. at 10–11.

Petitioner also contends that the Board should have agreed with the dissenting Board Member that Petitioner has had "essentially an untarnished record since 1979." *Id.* at 13. However, to hold that the BIA should have embraced this conclusion involves accepting one of two arguments. The first is that the IJ should not have questioned Petitioner or his wife concerning the 1986 arrest nor introduced the FBI rap sheet. As discussed above, we think the Board permissibly determined that it need not adhere to section 1000.5 in conducting its section 212(c) analysis. The second is that, even if the California diversion statute doesn't apply, the conclusions that the BIA drew from the arrest were impermissible.

■■■ Although we would be troubled if this were a case in which the Board found the *mere fact* of arrest probative of whether Petitioner had engaged in underlying conduct,[15] here, the Board had before it much more. Petitioner testified that he was arrested at a friend's house at which drugs were found. This friend was an acquaintance from Petitioner's days as a gang-member, when Petitioner abused PCP, *see* Admin.Rec. at 114, 136, and Petitioner admitted that he sometimes (albeit rarely) associated with the people he was involved with during that period, *id.* at 108.[16] Although Petitioner maintains that he was arrested merely because he was in the wrong place at the wrong time, his testimony concerning the precise circumstances of the arrest and search of the friend's house was contradictory.[17] Moreover, he admitted that his friend had drugs for sale. Whether or not this evidence would have been sufficient to justify a conviction,

we do not believe that, under the substantial evidence standard, *see INS v. Elias–Zacarias,* —— U.S. ——, —— n. 1, 112 S.Ct. 812, 815 n. 1, 117 L.Ed.2d 38 (1992), a reasonable factfinder would be compelled to reject the Board's conclusion that the arrest "demonstrates his ... probable continued use of illegal drugs," Admin.Rec. at 10. In addition, we believe the Board permissibly determined that Petitioner's uttering of obscenities toward the arresting officers was probative of his "bad character and disrespect for the law." *Id.*

■■■ Finally, again relying upon Board Member Dunne's dissent, Petitioner argues that, in determining rehabilitation, the Board should have placed significant emphasis on the fact that he had taken responsibility for his past criminal conduct. However, the record reveals that Petitioner denied responsibility for possessing a concealed weapon in an automobile despite the fact he was convicted for that offense. *See* Admin.Rec. at 116, 187. Moreover, although Petitioner was convicted on four counts of armed robbery in August 1979, Petitioner initially denied his involvement in two of them. *See id.* at 130. Finally, with respect to the May 1979 robbery, Petitioner admitted he was arrested but insisted that he "didn't commit that robbery." *Id.* at 134. In light of this testimony, we cannot conclude the Board erred in failing to take into account Petitioner's quite limited acceptance of responsibility.

■■■ Accordingly, we find that substantial evidence supports the Board's determination both that Petitioner gave false testimony to the IJ for the purposes of obtaining section

---

**15.** *Cf. Sierra–Reyes v. INS,* 585 F.2d 762, 764 n. 2 (5th Cir.1978) (contending, in dicta, that police reports concerning conduct for which no prosecution resulted "were not probative of anything and should not have been counted as 'adverse factors'" in denying section 212(c) relief).

**16.** Indeed, even dissent Board Member Dunne conceded that Petitioner's "continuing association" with this friend constituted an appropriate adverse factor. *See* Admin.Rec. at 14 (Dunne, concurring in part and dissenting in part).

**17.** Petitioner initially testified that the police went straight into the friend's house, searched around, and found the drugs in a bag. He then testified that they came out and arrested him both because of his attitude toward them and because "he was the closest" to the drugs. *See* Admin.Rec. at 139–40; *see also id.* at 12 (Dunne, concurring in part and dissenting in part) (interpreting Petitioner as testifying that he was standing next to a drawer in which the drugs were found). If Petitioner truly was outside of the house, yet the drugs were found inside, Petitioner's story makes no sense.

212(c) relief and that Petitioner failed to demonstrate rehabilitation. We thus find no basis for concluding that the Board abused its discretion in weighing the factors involved. The Board noted that Petitioner exhibited "unusual or outstanding equities," determined that significant countervailing adverse factors were present, and permissibly found that Petitioner had failed to establish rehabilitation.[18] It then weighed the adverse factors against the positive factors in light of the lack of rehabilitation, and concluded that the adverse factors outweighed the positive equities.[19] Because the Board did not rely on any inappropriate factors, applied the correct methodology in comparing the factors, and weighed them in a reasonable manner, we cannot find that the result reached was impermissible.

### IV. Conclusion

For the reasons articulated above, we hold that the BIA was not compelled to honor the strictures of the California diversion scheme in this case. In addition, we conclude that the Board did not abuse its discretion in denying Petitioner relief under section 212(c). Accordingly, the petition for review is

DISMISSED.

---

18. We note that, in making this determination the BIA appropriately took into account not only Petitioner's arrest, but also the fact that he successfully completed the diversion program.

19. Unlike in *Yepes–Prado,* the Board here recognized that rehabilitation is not a *prerequisite* for obtaining relief but only "a factor to be consid-

ered in the exercise of discretion." Admin.Rec. at 9 (citing *Edwards*). *Cf. Yepes–Prado,* 10 F.3d at 1373 (concluding that the BIA inexplicably departed from *Edwards* by stating that rehabilitation *must* be established when a criminal record exists).