[No. G014974. Fourth Dist., Div. Three. Aug. 31, 1994.]

J.A. JONES CONSTRUCTION COMPANY, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
DAI-ICHI KANGYO BANK, LTD., Real Party in Interest.

1570

**COUNSEL**

Aiken, Kramer & Cummings and Bruce G. Herold for Petitioner.

No appearance for Respondent.

Brown & Brown, Howard B. Brown and Ronald J. Mandell for Real Party in Interest.

**OPINION**

**SILLS, P. J.**—Felix Frankfurter once made fun of the tendency of courts to look at legislative history rather than the actual words of the statute. "[T]his

is a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute," he wrote. (*Greenwood* v. *United States* (1956) 350 U.S. 366, 374 [100 L.Ed. 412, 419, 76 S.Ct. 410].)

The instant writ petition presents a variation on Frankfurter's observation. In the wake of this court's decision in *Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233 [8 Cal.Rptr.2d 298], the Legislature modified the prescribed release forms by which contractors and subcontractors waive mechanics' lien rights. While the Legislature clearly was "responding" to the decision, reports of *Halbert's Lumber*'s death are somewhat exaggerated. There is no clear statement in the history of the new legislation that the *old* (unmodified) forms should be interpreted differently than they were in *Halbert's Lumber*. Nothing in the actual changes in the statutory text makes them retroactive and the Legislature passed up the perfect opportunity to undo *Halbert's Lumber* regarding the old forms: at the same time the Legislature was considering changing the existing release forms, *another* bill was introduced declaring that the modifications were to "reinforce what the Legislature originally intended." That particular bill did not pass.

In the face of the actual text of the recent changes—which by their terms operate only prospectively—and the lack of a clear statement from the Legislature that the recent modifications merely *clarified*, rather than *changed*, existing law, we conclude that *Halbert's Lumber* remains applicable to the old forms. Having made that determination, the instant writ petition, which depends on the demise of *Halbert's Lumber* as it pertains to those forms, must be denied.

I

In March 1989 J. A. Jones Construction Company agreed to build a beachfront hotel for Waterfront Construction. In return it was to be paid about $29 million. The contract required Jones to send in payment applications for work done the immediately preceding month accompanied by waivers releasing Jones's rights to assert mechanics' liens "through the date" of the applications.

Two lien waivers, signed after construction was substantially completed, concern us now. The first was a "conditional waiver and release upon progress payment," dated October 17, 1990. It recited that Jones had received a check for some $2.2 million; when the check was paid by the bank, the waiver would "become effective to release pro tanto any mechanic's lien, stop notice or bond right the Undersigned has on the [hotel] to the following extent." It then said that the release "covers a progress payment for labor,

services, equipment or material furnished . . . through September 15, 1990 (Date covered by Payment) only and does not cover any retention or items furnished after said date."[1]

The second waiver was dated November 8. This document provided that Jones had received about $27.4 million for the "project through 8/15, 1990," and did thereby "release pro tanto any mechanic's lein [sic], stop notice, equitable lien or labor and material bond right that [Jones]" had "to the above extent only" and did "not cover any retention or items furnished after that date." The waiver further stated that "THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGNED, EVEN IF YOU HAVE NOT BEEN PAID."[2]

There is no dispute that only $5,000 of labor and materials was furnished to the hotel after September 15.

Jones claimed that work changes meant it was owed about $3 million more than the contract price and filed a mechanic's lien for an unpaid $1,876,000. Waterfront sued Jones for construction defects, including a subsiding pool, cracked glass, collapsing ductwork and peeling paint. Jones cross-complained to foreclose its mechanic's lien, naming Dai-Ichi Kangyo Bank, the construction lender, as one of the defendants. Jones filed a lis pendens on the hotel property in July 1991.

---

[1]Here is the text as a whole:

"Upon Receipt by the Undersigned of a check from The Robert Mayer Corporation in the sum of $2,245,492.00 payable to the Undersigned (or to any Designee of the Undersigned) and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective to release pro tanto any mechanic's lien, stop notice, or bond right the undersigned has on the Project of *Waterfront Hilton Hotel* (Owner) located at Huntington Beach, Calif. (Project Description and Location) to the following extent. This release covers a progress payment for labor, services, equipment, or material furnished to The Robert Mayer Corporation through September 15, 1990 (Date covered by Payment) only and does not cover any retention or items furnished after said date. Before any recipient of this document relies on it, said party should verify evidence of payment to the Undersigned."

[2]Here is the text as a whole:

"The undersigned hereby acknowledges that the undersigned has received prior payment(s) in the amount of $27,412,944.00 for labor/services/equipment and or material furnished to the above designated project through 8/15, 1990 and does hereby release pro tanto any mechanic's lien, stop notice, equitable lien or labor and material bond right that the undersigned has to the above extent only and does not cover any retention or items furnished after that date. This release is for the benefit of and may be relied upon by the owner, the prime contractor, the construction lender, and the principal and surety on any labor and material bond posted for the project.

"NOTICE: THIS DOCUMENT WAIVES RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGNED, EVEN IF YOU HAVE NOT BEEN PAID. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL RELEASE FORM."

Trial commenced in July 1992. In April of the next year, a judge determined after a court trial that the net result of the claims and counterclaims was that Waterfront owed Jones $803,396. Further, Jones's mechanic's lien had priority over the bank's first trust deed because the bank did not file its deed until after Jones had commenced work. But the judge also concluded, following *Halbert's Lumber, Inc.* v. *Lucky Stores, Inc., supra,* 6 Cal.App.4th 1233, that the two lien waivers had released everything Waterfront owed Jones except for the $5,000 worth of work done after the September 15 release date.

Before judgment could be entered, Waterfront filed for chapter 11 bankruptcy. In June 1993 the bank requested the court to expunge the lis pendens on the theory that $5,000 would secure adequate relief to Jones from any damage resulting from the expungement. (See Code Civ. Proc., § 405.33.) The motion was heard on September 10, 1993, and the court expunged the lis pendens on condition that the bank give a $10,000 undertaking.

The day before the September 10 hearing, the Legislature passed Senate Bill No. 934 (sometimes hereafter referred to as SB 934). Exactly what Senate Bill No. 934 was intended to do is discussed below, but for the moment it is sufficient to note the legislation was aimed at doing *something* about the state of the law in the aftermath of *Halbert's Lumber.* Armed with this new development Jones brought a motion for reconsideration, arguing that the new legislation showed that *Halbert's Lumber* was sufficiently vulnerable as precedent to justify a larger undertaking (i.e., that Jones had not really waived its right to a mechanics' lien for most of the unpaid $800,000). Jones even attached the declaration of the author of SB 934, state Senator Quentin Kopp, who declared that "[o]ne of the purposes" of his introducing the bill was his "belief that the court in *Halbert's Lumber* v. *Lucky Stores* (1992) 6 Cal.App.4th 1233 [8 Cal.Rptr.2d 298], misinterpreted the legislative intent of Civil Code § 3262."

The motion for reconsideration was denied, and Jones sought a petition for a writ of mandate ordering the trial court to vacate its order expunging the lis pendens and deny the motion or, alternatively, require the undertaking be increased to $1 million. We issued an alternative writ of mandate to consider the matter.

## II

In *Halbert's Lumber* a materials supplier furnished a quantity of "glu lam" beams to a jobsite, then signed a release of lien rights and waited a period of time before it billed the subcontractor for the beams. The subcontractor went

broke and the supplier sought payment by trying to foreclose on a mechanics' lien that encompassed the cost of the beams. This court held that the particular release form signed by the supplier (and prescribed by the Legislature in Civil Code section 3262, subdivision (d)(1)) operated to waive any mechanics' lien rights for materials "furnished" through the date of the release, even though the materials had not yet been billed. (*Halbert's Lumber, Inc.* v. *Lucky Stores, Inc., supra,* 6 Cal.App.4th at p. 1251.)

Contractors and subcontractors were quick to notice that the rule in *Halbert's Lumber* would force them to be, as a state Senate Judiciary Committee report would later put it, "extremely careful in matching their billing dates to the date of the releases." Contractors would need to make sure that their "billing practices account and charge for all labor and materials furnished through the specified release date."[3]

In response to *Halbert's Lumber* two bills were introduced in March 1993: Assembly Bill No. 1845 by Assemblymember Mickey Conroy (sometimes hereafter AB 1845), and Senate Bill No. 934 by Senator Quentin Kopp. Senate Bill No. 934 was passed in September and signed by Governor Wilson in October. (See 1993 Stats., ch. 1249.)

Jones presses a more sophisticated argument than merely that the recent legislation should be given retroactive effect. Rather, it contends that the introduction of Senate Bill No. 934 and Assembly Bill No. 1845, both in response to *Halbert's Lumber*, shows that the Legislature *originally intended* the forms considered in *Halbert's Lumber* to be limited to the extent of the payment actually made. Ergo the release forms in the present case should be read to mean that they do not cover any retention before or after the release, or any extras for which payment has not been received.[4]

The argument fails, however, because there is no *clear statement* in the legislative history of SB 934 about what the Legislature *originally intended* in 1984 when it drafted the language interpreted by *Halbert's Lumber*. If anything, the failure of AB 1845 to pass indicates that the Legislature decided to acquiesce to the *Halbert's Lumber* decision as it applied to the *old* forms and begin afresh with new ones.

---

[3] See Report for Senate Judiciary Committee Hearing on Senate Bill No. 934 set for May 25, 1993 (1993-1994 Reg. Sess.). The need to be "careful" in matching billings to release dates was also noted in a Senate Rules Committee analysis of Senate Bill No. 934 dated June 7, 1993 (1993-1994 Reg. Sess.).

[4] The release forms in the present case, and in *Halbert's Lumber*, were the product of 1984 legislation seeking to do something about another court decision, *Bentz Plumbing & Heating* v. *Favaloro* (1982) 128 Cal.App.3d 145 [180 Cal.Rptr. 223], which invalidated all lien releases and (temporarily) dried up construction lending in California. (See *Halbert's Lumber, Inc.* v. *Lucky Stores, Inc., supra,* 6 Cal.App.4th at p. 1248.)

## III

The extent to which the intent behind a law is to override the actual words of that law is one of those eternal questions that will always be around to challenge lawyers and jurists. Suffice to say we are obviously not going to resolve it now. What we *can* do, however, is ascertain a few basic principles applicable to the case at hand.

██ We start with the two statutes bearing directly on the interpretation of statutes, sections 1858 and 1859 of the Code of Civil Procedure.[5] Section 1858 is a simple declaration. "In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, *not to insert what has been omitted, or to omit what has been inserted . . . .*" (Italics added.)

But the court's task is a little more complex than just sticking to the text. Section 1859 directs the court to a consideration of the intent of the Legislature *if possible*. "In the construction of a statute the intention of the Legislature, and in the construction of the instrument the intention of the parties, is to be pursued, if possible . . . ."

The two statutes could easily collide were it not for those two words "if possible" in section 1859. By putting those escape words in the "intent" statute rather than the "text" statute, it appears that, when push comes to shove, inescapably plain text should prevail. (Or, to be precise, plain text will prevail most of the time—there are a few exceptions, mentioned in passing below, for scrivener's errors, absurd results, and results at odds with the *unmistakable* or *clear* intent of the Legislature.)

So courts should start, as we did in *Halbert's Lumber*, with the actual language of the statute, and if the text is clear as applied to a given case, and it does not fall into any of the exceptions, stop there. (See *Halbert's Lumber, Inc.* v. *Lucky Stores, Inc., supra*, 6 Cal.App.4th at p. 1238, and authorities cited.) As Oliver Wendell Holmes said, "we do not inquire what the legislature meant; we ask only what the statute means." (See *Leslie Salt Co.* v. *San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 614, fn. 11 [200 Cal.Rptr. 575], quoting Holmes, Collected Legal Papers (1920) p. 207.) If there is any "modern trend" in this area, it is more and more to

---

[5] All further references to section 1858 or 1859 are to the Code of Civil Procedure. All other references, unless otherwise indicated, are to the Civil Code.

emphasize the actual words of the statute. (See generally, Eskridge, *The New Textualism* (1990) 37 UCLA L.Rev. 621 [hereafter Eskridge].)[6]

■ Ambiguous texts are another matter. If something needs to be added or omitted to determine how the statute should apply in a given case, section 1859 directs the court to the intent of the Legislature in enacting that text. We faced precisely this problem of a hopelessly ambiguous text in *Halbert's Lumber, Inc.* v. *Lucky Store, Inc., supra,* 6 Cal.App.4th 1233.[7] Accordingly, we turned to the legislative history to see if any intent could be discerned to illuminate the ambiguous statute.

It was at that point, according to Jones, that we erred. If we had perhaps just been a tad more perceptive in reading the legislative history, we might have divined the intent of the Legislature that the release should extend only to actual payment received.

There are those who would say that even in looking at legislative history we were on shaky ground. (E.g., *Conroy* v. *Aniskoff* (1993) 507 U.S. __ [123

---

[6]This is the most recent trend, as distinguished from the trend in the 1940's and 1950's, which was the other way. (See Eskridge, *supra,* at pp. 627, fn. 16 and 640.) For a recent textbook example of a California court's willingness to bite the bullet and adhere to the plain meaning of a statutory scheme despite a result which the justices might not have preferred, see *Unzueta* v. *Ocean View School Dist.* (1992) 6 Cal.App.4th 1689 [8 Cal.Rptr.2d 614] (construing backpay statute in the Education Code together with diversion statute in the Penal Code to allow a teacher to collect backpay after he had been suspended for possession and use of cocaine). A good example of the trend at the federal level is *P. R. Consumer Affairs Dept.* v. *Isla Petroleum* (1988) 485 U.S 495 [99 L.Ed.2d 582, 108 S.Ct. 1350] (upholding petroleum price controls in Puerto Rico in wake of congressional deregulation of petroleum market because, even if Congress intended a free market in such products, that intent was not actually expressed in the deregulating statute).

Arguments from "trends," however, are dubious at best, relying on a kind of chronological chauvinism which assumes that the direction that things are headed is inherently better than where they are coming from. Obviously this is not always true: some of the "modern trends" in Europe and Russia of the 1930's were dreadful.

[7]The legislative history of the most recent changes to the lien waiver statutes does not show that anyone ever seriously questioned our determination in *Halbert's Lumber* that the lien waiver statutes were ambiguous. The most sustained analytical criticism of the decision of which we are aware was in an article by attorney Richard Holderness entitled *The Halbert's Case: A Dilemma for the Construction Industry,* appearing in issue 92-6 of a publication called AGC (Associated General Contractors) Legal Briefs. That article, however, appears to agree with the *Halbert's Lumber* decision that the statutory forms for progress payment releases were ambiguous: "As demonstrated by *Halbert's,* the statutory forms for progress payment releases are ambiguous about whether the release extends only to the amount of the progress payment *or* to all labor and materials furnished through the date specified on the form." (*Id.* at p. 3, original italics.) A report for an Assembly Judiciary Committee hearing set for June 7, 1993, took the same view of the "pro tanto" language in the old release forms, describing it as "confusing."

L.Ed.2d 229, 238, 113 S.Ct. 1562, 1567] (conc. opn. of Scalia, J.) ["[l]egis-lative history [is] the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends"]; Note, *Why Learned Hand Would Never Consult Legislative History Today* (1992) 105 Harv. L.Rev. 1005, 1016-1017 (hereafter Learned Hand Note) [arguing that lobby-ists and legislators have gotten wise to the judiciary's use of legislative history and now try to shape it "for results that could not have won majority support" and therefore any use of legislative history is illegitimate].)

And we must acknowledge that the criticisms of judicial use of legislative history are formidable indeed: The Constitution does not elevate the bits and pieces that make up any legislative history to the status of law—it reserves that honor only for the text of legislation that has run the gauntlet of the Legislature and the Governor's possible veto.[8] The members of the Legisla-ture have no opportunity to disapprove legislative history, and the Governor has no chance to veto it.[9] Legislative history directly represents only the views of the few actors in the legislative process, including lobbyists and committee staff people, who are intimately involved with particular legisla-tion.[10] It is virtually impossible to accurately reconstruct exactly what went on when a legislative body passed a bill.[11] Legislative history has become contaminated by documents which are more aimed at influencing the *judi-ciary* after the bill is passed than explaining to the rest of the *legislature* what the bill is about before it is passed.[12] Most basically, the idea that the diverse membership of a democratically elected legislature can ever have one col-lective "intent" on anything is a myth; if there is ambiguity it is because the legislature either could not agree on clearer language or because it made the deliberate choice to be ambiguous—in effect, the only "intent" is to pass the matter on to the courts.[13]

Formidable as these criticisms are, they do not warrant a blanket rule against all use of legislative history. For example, there are no good reasons

---

[8]Eskridge, *supra*, at page 671; see also Learned Hand Note, *supra*, at page 1007. As we put it in *Halbert's Lumber*, ". . . it is the language of the statute itself that has successfully braved the legislative gauntlet. It is that language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed 'into law' by the Governor." (6 Cal.App.4th at p. 1238.)

[9]See Eskridge, *supra*, at page 650; Learned Hand Note, *supra*, at page 1007.

[10]See Eskridge, *supra*, at page 645 (even the most thorough analysis of legislative intent represents the views of only a "handful of legislators").

[11]See Eskridge, *supra*, at pages 644-645.

[12]See Eskridge, *supra*, at page 644; see generally, Learned Hand Note, *supra*, at pages 1015-1021.

[13]See Eskridge, *supra*, at page 677.

a scrivener's error cannot be corrected by reference to legislative history. (E.g., *Silver* v. *Brown* (1966) 63 Cal.2d 841, 845-846 [48 Cal.Rptr. 609, 409 P.2d 689] [mistake in describing boundaries of an assembly district because someone assumed that University Avenue and La Mesa Boulevard were the same street]; *Central States Pen. Fund* v. *Lady Baltimore Foods* (7th Cir. 1992) 960 F.2d 1339 [wrong date used in statute specifically aimed at a single company then in litigation over its liability for withdrawing from a pension fund].) And, in the face of a genuine ambiguity which cannot be cleared up using standard canons of construction,[14] what better way to fill the void than with the intent of the people who actually approved the law in the first place? (§ 1859; cf. *Zipton* v. *Workers' Comp. Appeals Bd.* (1990) 218 Cal.App.3d 980, 987 [267 Cal.Rptr. 431] [court expected that parties should brief legislative history when there is a "difficult issue to resolve" and a "troublesome set of circumstances"].) By the same token, a void created by an absurd result should also be filled, as section 1859 would have us, with the intention of the legislature, *if possible*. If legislative intent is *genuinely reflected* in the legislative history of a given bill, there is no good reason to ignore it just because of the formidable criticisms that may be leveled at legislative history *generally*. (See *Wisconsin Public Intervenor* v. *Mortier* (1991) 501 U.S. 597, 611, fn. 4 [115 L.Ed.2d 532, 547, 111 S.Ct 2476, 2485 ["Legislative history materials are not generally so misleading that jurists should never employ them in a good faith effort to discern legislative intent."].)

The real problem, as we discovered in *Halbert's Lumber*, is that reading the tea leaves of legislative history is often no easy matter. Even assuming there is such a thing as meaningful collective intent, courts can get it wrong when what they have before them is a motley collection of authors' statements, committee reports, internal memoranda and lobbyist letters. Related to this problem are the facts that legislators are often "blissfully unaware of the existence" of the issue with which the court must grapple,[15] and, as mentioned above, ambiguity may be the deliberate outcome of the legislative process. In light of these factors, the wisest course is to rely on legislative history only when that history itself is unambiguous. (See *Milligan* v. *City of Laguna Beach* (1983) 34 Cal.3d 829, 831 [196 Cal.Rptr. 38, 670 P.2d 1121] [legislative "purpose" controlled where it had been stated in "unmistakable

---

[14]For example, interpreting the statute in context of the statutory scheme in which it appears and endeavoring to avoid an interpretation which renders any part of the statute surplusage.

[15]See Eskridge, *supra*, at page 652, footnote 118, quoting the "Legislative History Speech" of Justice Scalia delivered at various law schools (copy on file with the UCLA L.Rev.); see also Learned Hand Note, *supra*, at page 1022 (considering the "problematic issue" of "questions that the legislature has not considered at all").

terms"]; see also *Clavell* v. *North Coast Business Park* (1991) 232 Cal.App.3d 328, 332 [283 Cal.Rptr. 419] [court resorted to legislative intent where "crystal clear"].) Thus where statutory language was "inadequate" and the legislative history was "at best ambiguous," the United States Supreme Court recently rebuffed an argument that depended for its existence on a particular legislative intent. (*Wisconsin Public Intervenor* v. *Mortier, supra,* 501 U.S. 597 [115 L.Ed.2d 532, 111 S.Ct. 2476] [rejecting idea that Congress intended to preempt local government regulation of pesticides].)

By looking for a *clear statement* of intent in the legislative history we avoid the "contamination" problem.[16] A clear statement of intent allows a court to reasonably indulge the inference that the individual members of the Legislature may have given at least a little thought to that statement before voting on the bill.[17]

## IV

The legislative history of Senate Bill No. 934 contains no clear statement that the recent changes to the lien release forms prescribed in section 3262 were either (1) intended to operate retroactively or (2) intended merely as a clarification of existing law. By structuring the legislation as a modification of the prescribed forms, rather than a declaration as to how the old forms were to be interpreted, the Legislature appears to have decided to start afresh with *new* lien release forms instead of trying to undo *Halbert's Lumber* as it applied to the *old* forms.

The process appears to have begun in early 1993 when representatives from the San Diego chapter of the Associated General Contractors of California wrote to Assemblymember Phil Isenberg proposing legislation "[c]larif[ying]" the lien waiver and release forms.[18] The contractors' representatives saw the "problem" in the wake of *Halbert's Lumber* as one where contractors were straitjacketed into the use of prescribed forms. ("The problem is that . . . contractor[s] cannot modify the release form to protect themselves because the code requires that the form be 'substantially equivalent.' ") The "proposed solution" to the "problem" was to *amend* the forms

---

[16]Cf. Eskridge at pages 688-689.

[17]We are not unmindful of the incredible time demands put on modern legislators, who often have only a few minutes to study the multitude of bills presented to them. Of course, this itself militates against arguments based on the fiction of collective intent.

[18]See Letter from Paul Gladfelty and Dave Ackerman to Assemblymember Isenberg dated January 27, 1993. The letter is part of the record compiled by the Legislative Intent Service and is attached as an exhibit to Dai-Ichi Kangyo Bank's opposition to the instant writ petition. All references to legislative materials come from that compiled record.

"to strike the ambiguous phrase 'pro tanto' " and "substitute the phrase 'only to the extent of the payment stated above.' "[19]

In early March 1993, two bills were introduced dealing with the subject of lien waivers. AB 1845 contained a direct textual reference to *Halbert's Lumber*. The preamble of the proposed legislation was admirably plain and to the point. Section 1, subdivision (b) of the bill declared: "[T]he decision in Halbert's Lumber, Inc. v. Lucky Stores, Inc. 6 Cal.App.4th 1233 has misapplied the law as it was intended by the Legislature . . . ." Subdivision (c) of section 1 further declared that it was the "intent of the Legislature" to "supersede the holding" in *Halbert's Lumber* and "to reinforce what the Legislature *originally intended* when it enacted Section 3262 of the Civil Code." (Italics added.)

By contrast, the other bill, SB 934 introduced by Senator Quentin Kopp, made no reference to *Halbert's Lumber*, contained no urgency clause, and simply revised the lien waiver forms prescribed by section 3262. Senator Kopp's author's statement characterized the bill as a "modest modification to our current statutory forms." In particular, the original version of SB 934, as introduced on March 4, 1993, made it clear that the conditional and unconditional waiver forms prescribed in subdivision (d)(1) and (d)(2) of section 3262 released lien rights "only to the extent of the payment stated."

The result in *Halbert's Lumber*, however, was not without its supporters, primarily lenders and title companies. Senator Kopp received letters from representatives of the California League of Savings Institutions[20] and the California Land Title Association[21] opposing his bill.

---

[19] *Ibid.*

[20] "The effect of this bill would be to place lenders in the position of never knowing exactly what it is they paid for when they accepted release from a contractor . . . ." (Letter of Edward Levy to Sen. Quentin Kopp (Apr. 8, 1993).)

[21] "The Court of Appeal in *Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.* properly interpreted and applied Civil Code Section 3262 relating to mechanics' liens." (Letter of Lawrence E. Green to Sen. Kopp (Apr. 5, 1993).) The conclusion was reiterated in a joint letter dated July 9, 1993, from representatives of the California Land Title Association, the California Bankers Association and the California League of Savings institutions to Assemblymember Phil Isenberg.

Senator Kopp also received opposition to the bill from at least one private attorney who saw himself as a neutral observer simply seeking stability in the law. "As an attorney sitting on the fence viewing both sides of this issue, I would offer the following observations about SB 934. At the present time the issue is reasonably clear as to how Waivers and Releases are to be used and the effect of using them. . . . The changes asked for in SB 934 would shift the burden entirely to the party requesting the release. We would be back to the Bentz situation in that a party would not be able to ascertain from the Waiver and Release if the "bill" has in

Sometime prior to the Senate vote on the bill a compromise was worked out.[22] SB 934 was amended in the Senate on June 7 to drop the "only to the extent of the payment stated" language and substitute words which specified that the releases do "not cover any retentions retained before or after the release date;" "extras furnished before the release date;" "extras or items furnished after the release date;" or "rights based upon a written contract modification [except in certain circumstances]." Senator Kopp would later write to Governor Wilson that "[t]hroughout the debate on this measure, we attempted and in fact alleviated concerns of the banks and title companies."[23] For their part, lenders did *not* oppose the amended bill in the Senate[24] and SB 934 passed *unanimously* in the Senate.

The bill then went to the Assembly, where it was amended, among other things, to drop the phrase "rights passed upon a written contract modification."[25] Because the lien releases did not cover extras, however, the bill faced renewed opposition from lending interests, which continued through the bill's passage in the Assembly on a vote of 43 to 20, the Senate's approval of the Assembly amendments, and its arrival on the Governor's desk in mid-September.[26] Governor Wilson signed SB 934 into law on October 11, 1993.

AB 1845 did not pass.

## V

In working to pass SB 934 through the Legislature, the bill's proponents recognized the issue of what precisely should be released by the lien waiver

---

fact been paid or to what extent. This will create confusion and ambiguity in what is slowly becoming a stable area of the law." (Letter of Atty. Frank L. Rowley to Sen. Quentin Kopp (Apr. 15, 1993).)

[22]In May 1993 a representative of the Associated General Contractors of California wrote to Senator Kopp's chief of staff that "[i]n moving forward with the legislation it should be noted that what we are attempting to do is achieve a balance between the interests of the various parties." (Mem. of Paul Gladfelty to Dan Friedlander (May 3, 1993).)

[23]Letter from Senator Quentin L. Kopp to Governor Pete Wilson dated September 17, 1993.

[24]See letter from Maurine C. Padden, legislative counsel to the California Bankers Association to Governor Pete Wilson, dated September 10, 1993. "[I]t is because we thought we had agreement on [the issue of "extras"] when the bill was heard in the Senate, that we did not vigorously oppose its passage from the Senate to the Assembly earlier this year."

[25]The report for the Assembly Judiciary Committee hearing of June 7, 1993, stated that "[w]hile some modification of the conditional waiver and release form may be appropriate, this bill goes too far" in automatically exempting certain rights, including rights based on written contract modifications.

[26]Senator Kopp's letter to Governor Wilson dated September 17, 1993, stated that lenders' "last remaining concern [was] whether 'extras' should be excluded as an item for release in the progress payment release form."

forms prescribed in section 3262 to be an arcane and complex subject to which there are no easy answers. Senator Kopp described it as a "somewhat esoteric area of law" in his author's statement. Paul Gladfelty, the representative of contractor interests who appears to have been the most active in pushing the bill through the halls of Sacramento, said much the same thing in his letter to Governor Wilson urging signature: "This is an area of the law that does not lend itself to any clear cut answers with regard to whose interests should be protected."[27] Similarly, a consultant to the Assembly Judiciary Committee wrote that the complexities of the subject made him appreciate our comment in *Halbert's Lumber* that the scope of the conditional release form appeared but dimly in the statutory language and legislative history.[28]

The history of the legislation effecting the most recent changes to section 3262 of the Civil Code demonstrates the Legislature's "response" to *Halbert's Lumber* was *not* one of simply declaring that this court got it all wrong and that the *old* release forms must be interpreted as they were originally meant to be—to provide for releases only to the extent of actual payment. *If the Legislature had wanted to do that, it would have passed AB 1845.*[29] Rather, those who did not like the result in *Halbert's Lumber* acquiesced in a compromise, the end product of which was a set of *new* forms which, in the zero-sum game of mechanics' lien releases, tilt in favor of contractors rather than lenders or owners. It is the *compromise* that the Legislature wanted, not what one set of interests wanted but could not get. (See Easterbrook, *The Supreme Court 1983 Term, Foreward: The Court and the Economic System* (1984) 98 Harv. L.Rev. 4, 46 ["What Congress wanted was the compromise, not the objectives of the contending interests."].)

To be sure, there are a number of statements in the legislative history of SB 934—basically lobbyist and sponsor statements—to the effect that

---

[27]Letter of Paul Gladfelty to Governor Pete Wilson dated September 16, 1993. Gladfelty went on to state that SB 934 was "carefully crafted after much debate."

[28]Undated memorandum from Rubin Lopez to "All Interested Parties" re SB 934. "Working on this bill really makes me appreciate what Justice Sills said about this issue in the *Halbert's* decision. He states: 'Both the statutory language and the legislative history on this point are ambiguous, they shine like a dim lantern through a frosty window in a snow storm."

[29]In its petition for writ of mandate, Jones here draws precisely the opposite conclusion. It argues that because AB 1845 and SB 934 addressed the same subject in a similar manner, AB 1845—with its express statement that *Halbert's Lumber* was wrong as to the old forms—reflects the intent of the Legislature. Even assuming, however, tht legislation introduced in 1993 could declare what the intent of the Legislature was in 1984, Jones's argument fails. AB 1845 sought to *clarify* existing law; SB 934 to *change* it.

*Halbert's Lumber* was incorrectly decided.[30] The committee reports, by contrast, were more charitable, describing the problems that the decision had created for contractors, but not declaring that the court had misperceived an otherwise clear legislative intent.[31] The most direct evidence as to what the intent of the legislature was in 1984 when it enacted the old forms interpreted in *Halbert's Lumber* was equivocal. A memorandum from Paul Gladfelty to Senator Kopp's chief of staff dated May 3, 1993, shows that when the lobbyist asked one of the industry representatives who worked on the issue in 1983 as to what he could remember about the scope of the release form, the answer was that the representative "could not remember the details regarding the words 'pro tanto.' "

Of course it may still be true that, if it were possible to poll the members of the 1984 Legislature on the point (which it is not), they would say of *Halbert's Lumber*, to paraphrase T. S. Eliot, "That is not what we meant at all. That is not it, at all." But there was no *clear statement* of what they did mean either. (See *Halbert's Lumber, Inc.* v. *Lucky Stores, Inc., supra*, 6 Cal.App.4th at pp. 1247-1249.) Nor is there, as demonstrated above, a *clear statement* of what they meant *then* in the history of the most recent legislation.

Senator Kopp's declaration in support of Jones does not qualify as a clear statement. (See *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589 [128 Cal.Rptr. 427, 546 P.2d 1371] [court refused to consider the motives or understandings of individual legislators, including the author of the bill in controversy].) An individual legislator may make a statement that his or her

---

[30]From the author's worksheet to the Assembly Judiciary Committee, dated July 2, 1993: "In *Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.* the court incorrectly concluded [then follows a description of the holding]"; from a memorandum from Philip M. Vermeulen, a representative of the California Association of Sheet Metal and Air Conditioning Contractors, to members of the Assembly Judiciary Committee, dated July 8, 1993: "As a result of a misinterpretation by the court in the Halbert's case last year . . . ."; from Senator Kopp's letter to Governor Wilson dated September 17, 1993: "The *Halbert's Lumber* decision is clearly an example of bad facts making bad law . . . ."; from a memorandum listing "TALKING POINT ON SB 934 (KOPP)" from AGC representative Paul Gladfelty, apparently accompanying a memorandum to the entire Senate dated September 9, 1993: "The basic purpose of SB 934 is to correct an ill-conceived decision decided last year in the 'Halbert's Case' "; and from a letter from retired Senator John V. Briggs, written on behalf of the Engineering Contractor's Association to Governor Wilson dated September 27, 1993: "[alluding to, but not mentioning, *Halbert's Lumber*] . . . a very bad non-legislative judicial decision."

[31]The report of the Senate Judiciary Committee for a hearing set for May 25, 1993, references the need to "reverse Halbert's" and mentions, in a topic heading, that "Bad law [was] created by bad facts." The report is concerned, however, with showing the adverse effects of the decision, not with why—or even whether—it was decided incorrectly in the first place. A much shorter Senate Rules Committee report, undated but written after the bill had passed the Assembly, explains the adverse consequences of the decision for contractors but omits any characterization of *Halbert's Lumber* as bad law.

amendment was merely a clarification of existing law in an attempt to give the amendment a retroactive effect when the whole of the legislature would never have given the change such effect if the matter had been put before the legislature explicitly. (See *Matter of Tarnow* (7th Cir. 1984) 749 F.2d 464, 467 ["If a legislature decides to change a statute, some of the legislators may wish to give its change retroactive force, by describing it on the floor or in a committee report as a merely 'clarifying' change, though formally the change is only prospective and a majority of the legislature would not have voted to make it retroactive."].)

In the present case, the first form that Jones signed with a release date of September 15, is in critical respects identical to the one construed in *Halbert's Lumber*. Both forms said the release became effective "to the following extent" and then said the release covered a progress payment for various items furnished through a certain date. Like the form in *Halbert's Lumber*, the first form here contains no punctuation to alert the reader that it does not cover "any retention," "any retention at all," or, as the new forms clearly put it, "any retentions retained before or after the release date." Rather the release does not cover "any retention . . . after said date."[32] Again, as in *Halbert's Lumber*, the forms are ambiguous. (The difference is that this time there is precedent construing the meaning of the ambiguous terms.)

The second form, with the August 15 release date, is different in that it uses the phrase "to the above extent only" rather than "to the following extent," but this is just as ambiguous as the form construed in *Halbert's Lumber*. Like the first form, it is unclear whether the release covers retentions. It also is functionally the same as the form in *Halbert's Lumber*.

The trial court was correct. The releases signed by Jones released its mechanics' lien rights to everything but the $5,000 beyond its release date. Our decision regarding the continued viability of *Halbert's Lumber* as to the *old* forms obviates the need to consider the various other points raised by the parties in this writ proceeding. The alternative writ is hereby discharged and the petition of Jones Construction for a writ of mandate is denied.

Wallin, J., concurred.

**CROSBY, J.,** Dissenting.—*Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233 [8 Cal.Rptr.2d 298] was an unjust decision at

---

[32]As Professor Eskridge points out, one effect of courts looking more and more to the text of statutes is that punctuation becomes more significant. See Eskridge, *supra*, at page 664.

odds with authoritative texts and the Supreme Court (see *id.* at pp. 1243-1244), as well as with statutes, the legislative history discussed in the opinion,[1] and the plain language of the release. The words "this document shall become effective to release pro tanto" plainly indicated that the release was partial, i.e., to the extent of the payment. Black's Law Dictionary's definition of pro tanto was even set forth in the release before this court in *Halbert's Lumber*: "For so much; for as much as may be; as far as it goes." (Black's Law Dict. (6th ed. 1990) p. 1222, col. 2.) Although it purports to be a primer on interpretation, *Halbert's Lumber* violates several of the cardinal rules, e.g., that every part of a statute or instrument must be given effect to the extent possible (Civ. Code, § 3541; Code Civ. Proc., § 1858) and should be interpreted reasonably (Civ. Code, § 3542). This court simply excised the words pro tanto; the effect of the *Halbert's Lumber* decision was to render the phrase meaningless.

California Mechanics' Liens and Other Remedies (Cont.Ed.Bar 1988) section 4.39, page 217 states that a subcontractor's mechanics' lien rights "[u]sually . . . are released on a pro tanto basis, i.e., *to the extent of the payment* and usually only to the date of the document." (Italics added.) The same volume emphasizes the importance of accompanying a progress payment with "a release of lien, to be executed by the subcontractor, *to the extent of the payment*."[2] (*Id.* at § 5.34, p. 257, italics added.) The business and legal communities were entitled to rely on settled dogma. Instead, *Halbert's Lumber* has undoubtedly provided windfalls for many at the expense of materialmen and subcontractors.

I would issue a peremptory writ.

Petitioner's application for review by the Supreme Court was denied November 23, 1994. Mosk, J., and Kennard, J., were of the opinion that the application should be granted.

---

[1] The majority's discussion of the Legislature's reaction reveals *Halbert's Lumber* was thought to have been wrongly decided in many, perhaps most, quarters; but powerful political opposition prevented an outright declaration to that effect.

[2] In reaction to *Halbert's Lumber*, the Continuing Education of the Bar text notes, "In view of this decision, a claimant, when confronted with a release form, should modify the form to add language stating: 'The release is only to the extent of the amount of the subject progress payment and does not cover unbilled amounts, extra work, retention, claims, or any other amounts.' " (Cal. Mechanics' Liens and Other Remedies (Cont.Ed.Bar Supp. 1994) § 4.39, p. 51.)